UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

In Re                                                    Chapter 11

CCT COMMUNICATIONS, INC.,                                 Case No. 07-10210 (SMB)


                                    Debtor.
--------------------------------------------------------------x
GLOBAL CROSSING
TELECOMMUNICATIONS, INC.,


                                    Plaintiff,
                                                         Adv. Pro. No. 07-1942 (SMB)

            -against-


CCT COMMUNICATIONS, INC.,


                                    Defendant.
--------------------------------------------------------------x

**MEMORANDUM DECISION DENYING MOTION FOR
ADDITIONAL ADEQUATE ASSURANCE, GRANTING
DECLARATORY RELIEF ON SEVERED COUNTERCLAIMS,
GRANTING IN PART AND DENYING IN PART MOTION
FOR LEAVE TO AMEND THE COMPLAINT AND DENYING
MOTION TO STRIKE AMENDED REPLY TO COUNTERCLAIMS**


**A P P E A R A N C E S :**

NIXON PEABODY  LLP
Attorneys for Plaintiff
437 Madison Avenue
New York, New York 10022

            Robert N. H. Christmas, Esq.
                Of Counsel


MICHAEL J. SHORTLEY, III, ESQ.
Attorney for Plaintiff
Global Crossing Telecommunications, Inc.
1080 Pittsford-Victor Road
Pittsford, New York 14534

ROBINSON BROG LEINWAND GREENE
  GENOVESE & GLUCK P.C.
Attorneys for Defendant
1345 Avenue of the Americas
New York, New York 10105

     A.  Mitchell Greene, Esq.
      Of Counsel

WILEY REIN LLP
Attorneys for Defendant
1776 K Street, N.W.
Washington, D.C.  20006

     Andrew McBride, Esq.
     Bennett L. Ross, Esq.
     Howard Anglin, Esq.
      Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge:**

     The plaintiff, Global Crossing Telecommunications, Inc. ("Global Crossing") sells

telecommunications services to the defendant, CCT Communications, Inc. ("CCT").  After CCT

filed a chapter 11 petition, Global Crossing moved for additional adequate assurance under 11

U.S.C. § 366, and filed this adversary proceeding, primarily seeking certain declaratory relief.

CCT counterclaimed for monetary and declaratory relief.  Certain aspects of the counterclaims

and the motion under § 366 raise the same issue, to wit, whether Global Crossing could

unilaterally change CCT's rates.

     The Court severed these related counterclaims, and tried them together with the § 366

motion over two days.  For the reasons that follow, I conclude that Global Crossing is not

entitled to additional adequate assurance, and cannot unilaterally change CCT's rates in the

manner that it did.  In addition, Global Crossing's motion for leave to file an amended complaint

is granted in part and denied in part.  Finally, since Global Crossing will serve an amended

complaint, CCT will serve a new answer and counterclaims, and Global Crossing will reply to those counterclaims, CCT's pending motion to strike Global Crossing's amended reply to its existing counterclaims is denied as moot.

## FACTS[1]

At all relevant times, Global Crossing, a Michigan corporation, was a common carrier engaged in the business of providing telecommunications and other services. CCT, a Delaware corporation, was also a common carrier engaged in the business of buying telecommunications services from entities like Global Crossing and reselling those services to others. The parties began their business relationship in 2005 when they entered into a contract for Direct Inward Dial ("DID") service.[2]

### A.   The Parties' Contract

### 1.   The Retail Customer Agreement ("RCA")

In early 2006, CCT sought to expand beyond DID service, and purchase outbound long distance and toll free calling services from Global Crossing. Dean Vlahos ("Vlahos") met with Global Crossing representatives, and in early 2006, the parties signed the "Retail Customer Agreement" or RCA.[3] (PX 1.) Under the RCA, Global Crossing levied a "per minute" usage charge based on the origin or destination of a call. (See id., App. 3.) The services were limited

---

[1]     The following conventions are used in citing to the trial record. The daily transcript is cited by date and page. For example, "Tr. (1/28) at 10" refers to page 10 of the January 28, 2008 transcript. "PX" refers to the Global Crossing's trial exhibits and "DX" refers to CCT's trial exhibits. Finally, "ECF/AP" refers to the electronic docket in this adversary proceeding, and "ECF/Case" refers to the electronic docket in the main case. The transcripts are filed as ECF Document numbers. 84 and 85 in the main case.

[2]     DID allows a person to dial someone directly at a business without being transferred.

[3]     The added services included VoIP (Voice over Internet Protocol) transmission. VoIP technology allows the telecommunications service provider to send calls over the Internet.

to the 50 states.  (<u>See</u> <u>id.</u>, App. 3.)  The RCA ran for three years, and CCT committed itself to pay a monthly usage guarantee, or MUG, of $60,000.  (<u>Id.</u>, at 6.)

The RCA included a provision that allowed Global Crossing to adjust its rates if CCT's "voice services profile" deviated from the "standard profile."  Appendix 1 provided:

> Our retail rates are based upon a standard profile of the distribution of traffic for retail customers.  <u>If we provide retail domestic or international outbound voice services to you under the Master Agreement, we reserve the right to review your voice services profile on a periodic basis and adjust rates based on that profile.</u>  If access costs for your traffic are higher than the average costs based upon a standard traffic profile, we may increase the net rate per minute for your retail voice services upon written notice to you.  Our average access costs will be calculated for the same period used to analyze your traffic.  In addition, we reserve the right to review your voice services access profile on a periodic basis and review whether your average call duration exceeds one (1) minute.  If for any reason your average call duration falls below one (1) minute, we reserve the right to analyze the financials of the existing traffic and either (i) increase rates; (ii) terminate the service.

(PX 1, App. 1 at 7)(emphasis added.)

## 2.      The Amendment to the RCA

In late 2006, Global Crossing developed a new pricing plan termed the "All You Can Eat" (the "AYCE" or "ACE") model.  The AYCE customer paid a flat rate in lieu of "per minute" usage charges for calls to specified geographic areas.  These destinations — the "Zero-Rated Destinations" — enjoyed a 100% discount from Global Crossing's usual usage rates.  (<u>See</u> Tr. (1/28) at 25-28, 59 and 83.)  Given the high monthly expense, the AYCE plan targeted customers that generated large volumes of traffic.  (Tr. (1/30) at 93; <u>see</u> Tr. (1/28) at 105.)  As part of a controlled introduction in late 2006, Global Crossing offered the AYCE plan to various customers, including CCT, Citigroup and Smith Barney, which "had unusually high volumes of traffic."  (Tr. (1/30) at 94.)

4

Rocco Tangredi ("Tangredi"), the Global Crossing salesman who dealt with CCT, sent Vlahos a description of the AYCE pricing plan that included a PowerPoint presentation. The slides specified the "call flows" covered by the flat-rate, monthly recurring charge under the AYCE plan. They comprised "all interstate calling" and "[a]ll calling to" certain international destinations, including the United Kingdom, Canada, Germany, The Netherlands, Italy and France. (DX RR, at 3; accord DX QQ, at 20.)

According to Tangredi, Vlahos was initially skeptical about the AYCE pricing plan because it sounded "too good to be true." (Tr. (1/30), at 94-95.) Tangredi kept calling Vlahos, and urged him to order services under the AYCE pricing plan. (Tr. (1/30) at 120.) Global Crossing viewed the proposed contract as an opportunity to make money, and was anxious to book the order before the end of the year. (Tr. (1/28) at 64-65; DX Q (Dec. 1, 2006 email from Thomas Guggino); DX AA (Nov. 17, 2006 email from Norman Kenyon); PX 24 (Nov. 28, 2006 email from Tangredi).)

Both sides focused on the anticipated volume of calls. Global Crossing asked CCT to provide a forecast of the amount of monthly terminating minutes by Local Access and Transport Area ("LATA").[4] (PX 24 (Nov. 28, 2006 email from Michael Hamdan to Vlahos).) Vlahos responded that since CCT was reselling Global Crossing's service, it had "no physical way of anticipating where the calls will come from or where they will go," that "traffic patterns are not going to stay the same either as time goes on and we take on new clients," and, consequently, he did "not feel comfortable making a forecast representation" because he wanted to avoid someone

---

[4]    A LATA is a geographical area that was created in connection with the consent decree breaking up AT&T. See United States v. Western Elec. Co., 569 F. Supp. 990, 993-94 (D.D.C. 1983); see also 47 U.S.C. § 153(25) (defining "LATA").

later "say[ing] that we misrepresented something."  Vlahos nonetheless predicted that Global

Crossing should anticipate more than 10 million minutes of monthly use in the continental 48

states.  (PX 24 (Nov. 28, 2006 email from Vlahos to Tangredi); DX VV (Nov. 28, 2006 email

from Michael Hamdan).)

That same day, Thomas Guggino ("Guggino"), Global Crossing's Director of Sales, sent

Vlahos an email asking him to outline the bullet points that CCT wanted in "a document."  (PX

23.)  Vlahos responded, inter alia, that the "rate per minute is $0," the "coverage area is defined

as 100% continental 48 states," and "[t]here are no restrictions on what percentage of the calls

terminate to certain areas versus other areas in the unlimited coverage area."  (Id.)  Global

Crossing understood that CCT would send as much traffic as it could sell, (Tr. (1/30) at 96), and

that it would send a high volume of traffic.  (Tr. (1/28) at 92-93).  The zero rate "per minute"

was critically important, because the AYCE only made economic sense if it substantially reduced

CCT's costs.  (Tr. (1/30) at 122-24.)  CCT had been paying no more than $60,000 per month for

Global Crossing's services under the RCA, but expected to commit to monthly recurring charges

of approximately $285,000 (plus taxes and fees) under the AYCE plan.  (Tr. (1/30) at 125-26.)

Some at Global Crossing expressed concern "that Global Crossing could lose money as a

result of selling the 'all you can eat' plan to a reseller."  (Tr. (1/28) at 93).  Alfonso DiGabriele

("DiGabriele"), Global Crossing's Vice President of Network Applications and Product

Management, also sounded an alarm.  In a November 17, 2006 email to Norman Kenyon

("Kenyon"), a Global Crossing IP Specialist, DiGabriele observed that judging from the amount

of capacity CCT intended to order and Vlahos' eagerness, "we could quickly get jammed and be

upside down big time."  (DX AA.)  In a December 8, 2006 email to Guggino and Kenyon,

DiGabriele warned that selling the AYCE to carrier-like companies such as CCT "isn't going to work given the level of risk it will create, and will force us to raise rates."  (DX HH.)

The parties nevertheless continued to press forward while the deal changed.  Although the Vlahos email of November 28, 2006 had only mentioned AYCE coverage in the continental United States, the AYCE plan, as noted, always included Western European landline destinations.  According to Vlahos, the international traffic became "relevant" to justify the increased costs that CCT was preparing to incur.  (Tr. (1/30), at 127-28.)

Vlahos had another concern.  He feared that notwithstanding its promotional materials, Global Crossing would try to impose "per minute" charges on traffic directed to the Zero-Rated Destinations.  To avoid this, he insisted on protective language.  He proposed that the Amendment state that "[t]he MRC [monthly recurring charge] for the bundled rate plan listed in Appendix 3 (attached hereto) apply in lieu of a rate per minute in areas where the discount is specified as 100%."  (Tr. (1/30) at 134-35 & 171; DX U.)  Vlahos discussed his proposed language with Guggino:

> I told him that I didn't like Appendix 1 convoluting something that was going to be an obligation to pay $300,000.00 a month so we need to eliminate that possibility and this was my suggestion.

(Tr. (1/30), at 136.)  Guggino responded that he did not have a problem with the proposed language.  (Id.)

The December 2006 amendment (the "Amendment," and together with the RCA, the "Agreement") eventually signed by the parties included two clauses that form the crux of the dispute.  The first incorporated the limitation proposed by Vlahos.  Paragraph 7 stated:

The monthly recurring charges ('MRC') of $71.00 per concurrent call session[5] for the bundled rate plan listed in Appendix 3 (attached hereto and incorporated by reference) shall apply in lieu of a rate per minute in those areas where the discount is specified therein as 100%.

(PX 2, at ¶ 7.)   The second provided that except as modified, the RCA continued in effect:

The remainder of the RCA and any other modifications thereto executed in writing between the Parties are not modified by this Amendment and remain in full force and effect.

(PX 2, at ¶ 9.)

The Amendment, in this regard, transformed the Agreement into a hybrid.  Under the Amendment, the AYCE plan charged a flat fee for unlimited service to Zero-Rated Destinations, and an undiscounted or partially discounted fee for traffic to other locations.  The distinction was captured in Appendix 3 annexed to the Amendment.  (PX 2 at App. 3.)  Appendix 3 consisted of 26 pages, each page initialed by both parties.  It identified the locations that received the 100% discount (i.e., the Zero-Rated Destinations), and the locations entitled to less than a 100% discount, or no discount.  The second set of destinations were subject to Global Crossing's "per minute" rates.  The parties also agreed that any amendment to implement the AYCE pricing plan would have a three-year term.  This was important to CCT because it enabled it to enter into one or two year contracts with its customers in order to meet its financial obligations to Global Crossing.  (Tr. (1/30) at 136-37.)

---

[5]        A concurrent (or simultaneous) call session refers to the number of concurrent calls that can occur over a given facility.  The capacity in the number of calls is akin to the size of a pipe delivering water – the larger the number of possible concurrent call sessions, the larger the "pipe," or telecommunications facility, is.

CCT signed the Amendment on December 11, 2006, and Global Crossing signed it two days later.[6]  In addition to the Amendment, the parties also prepared and signed a series of four order forms to implement the AYCE pricing.  (See PX 3.)  The first two entitled CCT to purchase 1,344 concurrent call session capacity at a monthly recurring charge of $71.00 per session, or a total of $95,424 per month (plus taxes and fees).  The second set of orders entitled CCT to purchase an additional 2,016 concurrent call session capacity for a monthly recurring charge of $71 per session, or a total of $143,136 per month (plus taxes and fees).[7]  Each of the order forms was signed by Vlahos and Guggino, and recited that "[t]his is a 3 year order under the all you can eat bundled voice Service in Appendix 3 to the RCA."

## B.    The Post-Amendment Disputes

Global Crossing regretted the deal before the ink was dry.  CCT had immediately started sending calls to international landline and mobile destinations.  (Tr. (1/30) at 144-47.)  This was the most profitable traffic to CCT, (Tr. (1/30), at 154-55), and was covered by the AYCE package.  (Tr. (1/28) at 60, 62 & 77-78; DX AAA)  In an email dated January 4, 2007, Guggino wrote to two Global Crossing employees:

> I need to speak to you regarding this [CCT] asap.  The appendix Dean [Vlahos] signed has discounts that I do not think we can honor.

(DX W.)

---

[6]    Global Crossing's standard form contract prohibited the resale of the services.  There was testimony and documentary evidence received at the trial showing that Global Crossing knew that CCT intended to resell the services.  Vlahos testified that he insisted upon assurances from Global Crossing before signing that CCT could resell the services, and received it.  Based on those assurances, he executed the Amendment.  The right to resell was not one of the issues consolidated for the expedited trial, and the Court does not make findings or reach conclusions on the issue.

[7]    The second order was never consummated.  CCT contends in a separate counterclaim that this constituted a breach of their agreement.  This issue is not presently before the Court.

1.    **Blocked International Traffic**

Global Crossing looked for ways to shut down the CCT international traffic.  Global

Crossing sent Vlahos a proposed contract amendment on or about January 10, 2007.  (PX 10.)

The amendment would have eliminated all mobile international calling areas and all calling areas

in the Caribbean from the scope of the AYCE pricing plan without reducing the monthly

recurring charges.  (See PX 10, App.. 3.)  Vlahos declined to sign it.

Glenn Swartz ("Swartz"), Global Crossing's Director of Credit and Collections, sent

CCT a letter the next day stating that because CCT refused to sign the proposed amendment,

Global Crossing had "blocked international capabilities" and would continue doing so "until

such time that CCT returns the executed Amendment."  In addition, Global Crossing would

terminate all services on January 25, 2007.  (PX 11.)   Vlahos still refused to sign, and the next

day, Global Crossing began blocking CCT's international calling capabilities except for Canada.

Thus, it blocked the Western European Zero-Rated Destinations indisputably covered by the

AYCE plan and the proposed amendment that Vlahos had declined to sign.  (PX 10, at App. 3,

pp. 4, 6, 7, 10.)  Global Crossing completed blocking CCT's international call termination

capabilities, except for calls to Canada, on or about January 17, 2007, and this situation has

continued to the present.  (Stipulated Statement of Facts, dated Jan. 2008, at ¶

13)("Stipulation")(ECF/AP Doc. # 54.)[8]

Following up on its threat, on or about January 26, 2007, Global Crossing sent a letter to

Vlahos purporting to terminate the Agreement, asserting that CCT's resale of Enterprise VoIP

---

[8]        CCT alleges that Global Crossing's blocking of its traffic constitutes a breach of contract and
violates Federal Telecommunications Law.  (First Amended Counterclaims of Defendant-Debtor CCT
Communications, Inc., dated Dec. 21, 2007, at ¶¶ 32-34 & 37-39(ECF/AP Doc. # 21, Ex. A).)  These issues
are not presently before the Court.

Local Service "constitutes a material breach" of the parties' contract. (PX 12.) Before Global

Crossing could actually terminate the services, CCT commenced its Chapter 11 proceeding on

January 28, 2007.

### 2.     The Unilateral Modification of Appendix 3

After Global Crossing blocked CCT's international calling capabilities, CCT was limited

to sending domestic traffic. The deal was still unprofitable to Global Crossing. According to an

email dated June 11, 2007 from David Hirsch ("Hirsch") at Global Crossing to DiGabriele and

others, CCT was generating "roughly $95k in revenue, but $234k in costs." Hirsch queried

whether there was "a limit to the amount of traffic CCT can send," and inquired whether there

were "any traffic profile provisions in the contract" that Global Crossing could use to "cut this

[traffic] off or force this customer to reduce traffic." (PX 29.) In another email dated June 11,

2007, Swartz informed Eileen Mahoney ("Mahoney")[9], Global Crossing's Vice President for

Advanced Solutions and Strategic Planning, that his "goal is to terminate this relationship and

stop the bleeding period" and he expressed concern that relying upon Appendix 1 in order to

implement "a short-term price increase could constitute acceptance of the" parties' contract.

(DX I; accord Tr. (1/30), at 40.]

Mahoney nevertheless reviewed CCT's traffic profile, although the task was not part of

her usual duties. (Tr. (1/28) at 168.) She determined that the volume of traffic that CCT was

sending over Global Crossing's network under the AYCE pricing plan exceeded the 1,500

minutes per concurrent call session that Global Crossing expected to see from a standard

enterprise customer, and the 4,500 minutes per concurrent call session, which Mahoney stated

---

[9]        At the time, Mahoney was known as Eileen Babcock. (See Tr. (1/28), at 166.)

was an "assumption" used by Global Crossing in developing the AYCE plan.  She recommended

that Global Crossing use the traffic profile language to adjust CCT's rates.  (Tr. (1/28), at 134.)

Following her review, Global Crossing sent CCT a letter, dated October 10, 2007 (PX

13) (the "October 2007 Notice"), stating that "[e]ffective immediately" an "overage charge" of

$0.0180 per minute would apply to "all minutes for all calls placed by the customer for this

service in a billing cycle" in excess of "4500 minutes for each concurrent call session in service

during that billing cycle."[10]  CCT disputed Global Crossing's right to impose the 4,500-minute

limit, and refused to pay Global Crossing's invoices that sought to collect the corresponding

charges.

## C.        The Proceedings in Bankruptcy Court

After the petition was filed, Global Crossing attacked on two fronts.  First, it moved

under 11 U.S.C. § 366 for an order allowing it to terminate CCT's service, or for additional

adequate assurance.  The motion culminated in an order, dated October 10, 2007, directing CCT

to post a $113,000 deposit.  (ECF/Case Doc. # 39.)  After Global Crossing imposed the call

limits and overage charges referred to in the October 2007 Notice, which CCT refused to pay, it

filed a second motion (the "Second § 366 Motion") on December 14, 2007.  (ECF/Case Doc. #

62.)  The principal issue raised by the Second § 366 Motion was Global Crossing's right to

unilaterally modify the rates set by Appendix 3.

Second, Global Crossing commenced this adversary proceeding to obtain declaratory and

other relief on July 23, 2007.  The complaint was limited to challenging CCT's right to resell

---

[10]    This was the same limit that Global Crossing had imposed when it rolled out the AYCE plan in
January 2007.  (See DX B, at ¶ 6.1.)

services.  Global Crossing has moved for leave to amend its complaint to assert additional

claims.  That motion is addressed later in this opinion.

CCT filed an answer and an amended answer that raised six counterclaims.  The first

counterclaim ("Count I") alleged that Global Crossing had breached the parties' contract by

blocking international calls, refusing to provide services ordered by CCT, interfering with

services provided to CCT and failing to render accurate bills.  The sixth counterclaim ("Count

VI") sought declaratory relief regarding CCT's rights under the Amendment, and in particular,

Global Crossing's efforts to impose limits on the AYCE package.  Because the Second § 366

Motion, Count VI and part of Count I (inaccurate billing) centered on the same facts and raised

the same issues, the order authorizing the amended answer severed Count VI and the related

claims in Count I, and directed them to be tried together with the Second § 366 Motion.

(ECF/AP Doc. # 29.)

## DISCUSSION

**A.     Ambiguity**

The issue before the Court is whether the parties' contract authorized Global Crossing to

impose the 4,500-minute limit and overage charges on traffic to the Zero-Rated Destinations.

The primary objective when interpreting a contract is to give effect to the parties' intent as

revealed in the language that they used.[11]   Sayers v. Rochester Tel. Corp. Supplemental Mgmt.

Pension Plan, 7 F.3d 1091, 1094 (2d Cir. 1993); Seiden Assocs., Inc. v. ANC Holdings, Inc., 959

F.2d 425, 428 (2d Cir. 1992).  Initially, the Court must determine, as a matter of law, whether the

agreement is ambiguous.  See Sayers, 7 F.3d at 1094-95.  An agreement is ambiguous if it is

---

[11]        The parties' contract is governed by New York law.  (RCA, at ¶ 15.)

capable of more than one meaning when viewed objectively by a reasonably intelligent person

who examines the entire contract and knows the customs, practices, usages and terminology

generally understood in the particular trade or business.  Nowak v. Ironworkers Local 6 Pension

Fund, 81 F.3d 1182, 1192 (2d Cir. 1996); Sayers, 7 F.3d at 1095; Seiden Assocs., 959 F.2d at

428; Walk-In Med.  Ctrs., Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987).

Where the parties' intent is not plain from the language they used, a court may look to the

objective manifestations of intent gathered from the parties' words and deeds.  Brown Bros.

Elec. Contractors, Inc. v. Beam Constr. Corp., 361 N.E.2d 999, 1001 (N.Y. 1977); Nycal Corp.

v. Inoco PLC, 988 F. Supp. 296, 301 (S.D.N.Y. 1997).  "The secret or subjective intent of the

parties is irrelevant."  Klos v. Polskie Linie Lotnicze, 133 F.3d 164, 168 (2d Cir. 1997).

Before scheduling the trial, I had concluded that Global Crossing's right to change the

AYCE rates was ambiguous, and reiterate that conclusion.  Global Crossing's position rests

entirely on Appendix 1 to the RCA.  According to Appendix 1, Global Crossing's rates were

based on "a standard profile of the distribution of traffic for retail customers."  If Global

Crossing provided outbound services under the "Master Agreement," it could periodically review

CCT's voice services profile, and adjust the rates based on that profile.  Global Crossing argues

that it can adjust any rate if CCT's voice services profile varies from "a standard profile of the

distribution of traffic for retail customers."  The next sentence in Appendix 1 is more specific.  It

allows Global Crossing to increase CCT's "net rate per minute" if the access costs for its traffic

exceed the "the average costs based upon a standard traffic profile."  Finally, the last sentence

allows Global Crossing to increase rates or terminate service if "your average call duration falls

below one (1) minute."  (RCA, at App.. 1).

Initially, it is not clear that Appendix 1 even applies.  By its terms, it relates to services provided under the "Master Agreement."  The "Master Agreement" is not defined.  Global Crossing provided services under a "Retail Customer Agreement," which defines itself simply as the "Agreement."  (See RCA, at p. 1.)

Assuming that it does apply, Global Crossing's interpretation of the second sentence renders the third sentence – the access charge provision – superfluous.  This construction is contrary to New York law.  See Manley v. AmBase Corp., 337 F.3d 237, 250 (2d Cir. 2003) (New York law "disfavors interpretations that render contract provisions meaningless or superfluous"); Two Guys From Harrison N.Y., Inc. v. S.F.R. Realty Assoc's, 472 N.E.2d 315, 318 (N.Y. 1984) ("[I]n construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless.").  If Global Crossing can change any rate based upon a variance from the standard traffic profile, it would be unnecessary for Appendix 1 to also provide that it could change access rates if CCT's access costs exceeded the average costs based on the standard traffic profile.[12]

Moreover, the Amendment arguably limits Global Crossing's rights under Appendix 1. Paragraph 7 provides for certain fixed costs "in lieu of a rate per minute in those areas where the discount is specified [in Appendix 3] as 100%."  Unlike the RCA, the AYCE services under the Amendment were provided at a fixed cost in lieu of a "per minute charge" for traffic to the Zero-Rated Destinations.  While paragraph 9 reaffirmed that the unmodified portions of the RCA remained in full force and effect, CCT maintains that paragraph 7 precluded Global Crossing

---

[12]    The same cannot be said of the final sentence, which grants rights to Global Crossing to increase rates or terminate service if the average call duration falls below one minute.  This provision does not depend on a standard traffic profile.

from imposing a "per minute" rate for the AYCE services to the Zero-Rated Destinations.

Hence, the profile-based "per minute" rate adjustments authorized under Appendix 1 did not

apply to those services.

The language in the RCA and the Amendment supports either interpretation.

Accordingly, the Agreement is ambiguous, and the Court must resort to extrinsic evidence to

decide its meaning.

**B.      The Meaning of the Parties' Agreement**

I find that the parties intended to enter into a fixed rate contract for the AYCE services to

the Zero-Rated Destinations, and that Global Crossing could not change these rates during the

life of the contract.[13]  That is how Global Crossing promoted the plan to CCT.  No promotional

material, other documentary evidence or testimony hints that the parties contemplated a limit on

traffic or the imposition of a "per minute" overage charge if traffic to the Zero-Rated

Destinations exceeded a limit.  Guggino did not recall discussing any limits.  (Tr. (1/28), at 63.)

And no one told Tangredi, Global Crossing's salesman, that there were any limits on usage under

the AYCE plan.  (Tr. (1/30), at 93.)

Furthermore, Vlahos testified credibly that he insisted on paragraph 7 in the Amendment

because of his concern that Global Crossing might invoke the traffic profile language in

Appendix 1 to change the deal.  Paragraph 7 substituted a fixed rate for a variable rate that was

not subject to change during the life of the contract regardless of the amount of traffic that CCT

sent over Global Crossing's network.  Vlahos discussed the rationale of paragraph 7 with

---

[13]      Guggino had testified that he told Vlahos that the arrangement was interim, and would last for a
month.  (Tr. (1/28), at 50.)  By the time they signed the deal and accompanying orders, they agreed to a
fixed term of three years.  It was not "interim" according to its terms.

Guggino, who had no problem with it.  In addition, Guggino understood that the attraction of the AYCE plan to CCT was that the net per minute rate would be zero.  (Tr. (1/28), at 68.)

In addition, Global Crossing signed the Amendment, if not with completely open eyes, then at least with an awareness of the risks.  Everyone understood that based on the structure of the AYCE plan, it was in CCT's interests to send as much traffic as possible.  Vlahos had estimated significantly more usage than in the past.  (Tr. (1/28), at 55-56.)  DiGabriele had sent internal warnings about the risks to Global Crossing.  Global Crossing nevertheless solicited CCT, anxious to close the deal and book income before the end of 2006.  Although the negotiations initially focused on domestic traffic, the deal expanded to include international locations as evidenced by Appendix 3, where each party initialed each page.  If Global Crossing had some other understanding or intention, it remained a secret known only to Global Crossing.

Finally, this construction does not effectively repeal Appendix 1, as Global Crossing contends.  (See Post-Trial Brief of Plaintiff Global Crossing Telecommunications, Inc., dated April 9, 2008, at pp.13-14.) (ECF/Case Doc. # 87.)  The fixed rate only applied to traffic to the Zero-Rated Destinations.  The remaining locations — and there were many judging by Appendix 3 — were subject to the "per minute" charge, and the traffic profile language.  As stated, the Amendment created a hybrid contract, and different rate structures applied to the two parts.

## C.   Relief

Accordingly, CCT is entitled to a declaratory judgment on Count VI as well as the related claim in Count I to the effect that Global Crossing breached the Agreement.  Specifically, and at a minimum, Global Crossing breached the Amendment by unilaterally modifying the fixed rate

applicable to traffic to the Zero-Rated Destinations, and imposing a minute-based limit on calls coupled with "per minute" overage charges.

For similar reasons, Global Crossing is not entitled to additional adequate assurance or the right to terminate services.  First, the Second § 366 Motion was premised on the illegal rate changes imposed by Global Crossing.[14]  Second, Global Crossing blocked traffic to the Western European landline destinations, which were undeniably covered by the AYCE plan.  See One Stop Realtour Place, Inc. v. Allegiance Telecomm., Inc. (In re One Stop Realtour Place, Inc.), 268 B.R. at 430 437-38 (E.D. Pa. 2001) (telecommunications carrier required "to restore telephone service prior to obtaining an adequate assurance payment").

The parties are directed to settle separate orders consistent with this opinion (1) granting declaratory relief to CCT in the adversary proceeding and (2) denying the Second § 366 Motion.

## D.    Motion to Amend Complaint

Global Crossing has also moved for leave to amend the complaint.  The original complaint focused exclusively on CCT's resale of Global Crossing's telecommunications services.  The proposed amended complaint ("PAC") adds the following four claims:[15]

| Cause of Action | Nature of Claim | Substance of Claim |
|---|---|---|
| 4 | Breach of the implied covenant of good faith and fair dealing | CCT unfairly and unreasonably sent unprecedented and non-negotiated volumes of |

---

[14]      Global Crossing failed to show what portion of the rate increase, if any, was based on traffic sent to the undiscounted or partially discounted locations, and attributable to a deviation from the standard traffic profile.

[15]      The First, Second and Third Causes of Action amplify the claims, alleged in the original complaint, that CCT wrongfully resold or shared the services it purchased from Global Crossing.  Although CCT opposes the entire motion to amend, it directs its challenge primarily at the Fourth through Seventh Causes of Action.

| | | traffic to non-negotiated destinations. |
|---|---|---|
| 5 | Reformation based on mutual mistake | As a result of the parties mutual mistake, Appendix 3 incorrectly included Caribbean and international mobile telephone destinations in the Zero-Rated Destinations |
| 6 | Reformation based on Global Crossing's unilateral mistake and CCT's fraud | Between November 28, 2006 and December 20, 2006, CCT misrepresented that it (1) intended to limit traffic to the 48 continental states and (2) made other specific representations that it would not take advantage of the incomplete state of the VoIP bundling service offering |
| 7 | Fraud | Same as Sixth Cause of Action |

In the main, the new claims allege that Appendix 3 never should have included a 100%

discount for any Caribbean destinations or international mobile telephone terminations.  Global

Crossing also contends that CCT defrauded it by representing that it would send less traffic than

it actually did, and that the traffic would be limited to the continental United States.  The new

claims seek damages and reformation.  In addition, the ad damnum clause refers to "rescission,"

and the parties seem to understand that Global Crossing is also seeking that remedy.  CCT

opposes the motion on numerous grounds, including undue delay, prejudice and futility.

Rule 15(a) of the Federal Rules of Civil Procedure governs motions for leave to amend

pleadings.  Generally, leave should be freely granted, but the court may deny the motion in

instances of undue delay, bad faith, dilatory motive, undue prejudice to the opposing party or

futility.  Foman v. Davis, 371 U.S. 178, 182 (1962).  While delay alone is insufficient, a court

may deny leave to amend where "after an inordinate delay, no satisfactory explanation is offered

for the delay, and the amendment would prejudice the defendant."  Cresswell v. Sullivan &

Cromwell, 922 F.2d 60, 72 (1990).  Legal prejudice involves consideration, inter alia, of whether

the new claim would require the opposing party to expend significant additional resources to

conduct discovery or prepare for trial and whether the amendment would significantly delay the resolution of the case.  Block v. First Blood Assoc., 988 F.2d 344, 350 (2d Cir. 1993).

The objections to the motion based on undue delay, prejudice, bad faith or improper motive are rejected out of hand.  Global Crossing commenced this action in July 2007, limiting its attack to the resale of its services.  CCT's original counterclaims focused primarily on Global Crossing's failure to provide services ordered by CCT and blocking CCT's ability to send international calls.

Global Crossing did not impose the new rate structure until October 2007, and the Second § 366 Motion, made in December 2007, raised for the first time the question of whether Global Crossing could modify the AYCE rates unilaterally.  CCT countered with a motion, on December 21, 2007, to amend its answer to assert related counterclaims for declaratory relief that Global Crossing could not modify the rates.  The Court granted the motion to amend on January 22, 2008, severed the related counterclaims, and directed that they be tried with the Second § 366 Motion.  The trial started only six days later.  After the Court tried the issues, it urged the parties to discuss settlement.  It appears that Global Crossing made its motion to amend after the settlement talks foundered.  In short, this case moved on a fast track, and there was no time for delay.

CCT also failed to demonstrate any concrete prejudice.  First, it challenges Global Crossing's right to change its legal theory after the close of discovery.  Discovery was originally scheduled to close on November 27, 2007, (see Scheduling Order, dated Oct. 11, 2007, at ¶ 4)(ECF/AP Doc. # 12), but was extended to January 18, 2008.  (See Second Scheduling Order, dated Dec. 20, 2007, at ¶ 4)(ECF/AP Doc. # 20.)  The Court did not authorize CCT to amend its

answer until the discovery deadline had expired, and it will be necessary to fix a new deadline anyway to allow discovery into the issues raised in CCT's amended answer and counterclaims.

Second, CCT contends that it will be forced to conduct additional discovery, but it is not clear how much additional discovery it actually needs, or the extent to which it is necessitated by CCT's new counterclaims. It is true that both sides have already conducted discovery, including depositions of the present and former Global Crossing employees with personal knowledge regarding the intent of the parties when the Amendment was signed. The new claims asserted by Global Crossing primarily raise contract formation issues. If CCT can demonstrate that it is being forced to incur additional, avoidable expenses because it must re-depose witnesses, it can seek appropriate relief from the Court to shift the cost to Global Crossing.

Finally, CCT argues that the proposed amendments are futile. "A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." Oneida Indian Nation of New York v. City of Sherrill, 337 F.3d 139, 168 (2d Cir. 2003), rev'd on other grounds, 544 U.S. 197 (2005). On a motion to dismiss a complaint under FED. R. CIV. P. 12(b)(6), a court must "accept all factual allegations in the complaint as true," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509 (2007); accord Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993), even if the allegations are doubtful in fact. Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007). The factual allegations must nevertheless be plausible, In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007); Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007), and "raise a right to relief above the speculative level." Bell Atlantic, 127 S. Ct. at 1965; accord ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). Furthermore, "a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a

claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." In re Livent, Inc. Noteholders Secs. Litig., 151 F.Supp.2d 371, 405-06 (S.D.N.Y. 2001); accord Tierney v. Omnicom Group Inc., No. 06 Civ. 14302 (LTS)(THK), 2007 WL 2012412, at *4 (S.D.N.Y. July, 11, 2007).

"[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, 127 S. Ct. at 2509. Courts may also consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, 493 F.3d at 98; accord Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007); Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000).

Because the analysis is the same as a motion to dismiss, I recount the allegations in the PAC relevant to the Fourth through Seventh Causes of Action. The following discussion uses the same abbreviations and definitions developed in the discussion supra, unless inconsistent with the PAC.

### 1.     The Parties' Agreement

CCT first obtained services from Global Crossing in or about September 2005. (¶ 13.)[16] In June 2006, the parties entered into the RCA, a new agreement that covered services CCT was

---

[16]     The parenthetical citation to a paragraph number refers to the PAC.   (ECF/AP Doc. # 43).

already using in addition to new services.[17]  (¶ 14.)  The RCA became effective on June 29, 2006.  (¶ 14.)

Effective December 13, 2006, the parties executed the Amendment.[18]  (¶ 15.)  Pursuant to paragraph 9 of the Amendment, and except as modified by the Amendment, the RCA remained in full force and effect.  (¶ 16.)  Under the Amendment, CCT subscribed to Global Crossing's VoIP Bundle retail pricing plan (the "VoIP Bundle"), a new plan that was not generally available to Global Crossing's customers until January 2007.  (¶ 17.)  The VoIP Bundle, referred to as an "All You Can Eat" or "ACE" or "AYCE" model, included VoIP Outbound domestic and international services, VoIP Toll-Free services and Enterprise Voice services.  (¶¶ 17, 25.)

The pricing for the VoIP Bundle was set forth in Appendix 3[19] to the Amendment.  (¶ 25, 45.)  Appendix 3 was prepared by Global Crossing's Enterprise Special Pricing Group, and was sent to Dean Vlahos, President of CCT, by email during the first week of December 2006.  (¶ 45.)  Under the Amendment and Appendix 3, CCT paid a monthly recurring charge of $71 per concurrent call session.  (¶ 25.)  Calls to certain destinations listed in Appendix 3 did not incur additional charges per minute of use (the "Zero-Rated," or "100% discount," Destinations).  The Zero-Rated Destinations included interstate traffic, intrastate calls in certain states where third-party access charges were low, and international calls to the Caribbean and certain Western European countries.  (¶ 25.)  Appendix 3 also included destinations that required the payment of additional charges per minute of use.  (¶ 25.)  After the Amendment was signed, the two parties

---

[17]    The RCA is attached to the PAC as Exhibit 1.

[18]    The Amendment is attached to the PAC as Exhibit 2.

[19]    Appendix 3 is annexed to the Amendment (Ex. 2.)

executed order forms for VoIP Outbound and VoIP Toll-Free service for 1344 and 2016 concurrent call sessions of capacity.  (¶ 24.)  Global Crossing ultimately provided the capacity of 1344 concurrent call sessions.  (¶ 24.)

### 2.      Mistakes in the Contract

The gravamen of the PAC concerns erroneous prices in Appendix 3.  First, the VoIP Bundle did not include Caribbean destinations in the Zero-Rated Destinations, and CCT knew this.  (¶ 48; see ¶ 26.)  Nevertheless, Caribbean destinations listed in Appendix 3 received a 100% discount, i.e., they did not incur additional usage charges.  (See PAC, at Ex. 2, App. 3.) Second, while the VoIP Bundle included Western European landlines, it did not include mobile (cellular) telephone terminations.  (¶¶ 26, 49.)  Appendix 3 included numerous international mobile terminations in Western Europe that did not incur additional usage charges.  (See PAC, at Ex. 2, App. 3.)  Upon information and belief, CCT knew or should have known that the VoIP Bundle did not include international mobile terminations.  (¶ 50.)  In fact, Vlahos had never requested Caribbean or international access.  (¶ 52.)

In addition, Appendix 3 should have been limited to one month's duration, or until January 2007, at which time Global Crossing planned to make the VoIP Bundle generally available to its customers.  In December 2006, General Crossing's billing system could not separate international landline from international mobile destinations within a given country or calling area.  The billing capability would be in place the following month with the general rollout of the product.  (¶ 51.)

### 3.      CCT's Fraudulent Conduct

On November 28, 2006, Guggino emailed Vlahos, to ask him to outline what he sought from the agreement in a document. (¶ 40.) In response, Vlahos represented that "[t]he coverage area is defined as 100% continental 48 states." (¶ 40.)

Throughout the two weeks between the email exchange addressing geographic coverage and the execution of the Amendment, Guggino and Terence Dohrmann, Global Crossing's Area Vice President for New York/New Jersey, continually requested assurance from Vlahos and relied on his assertions that CCT would be fair and reasonable and would not abuse Global Crossing's network through the VoIP Bundle. (¶ 41; see ¶ 53.) Upon information and belief, Vlahos provided these assurances with the intent to exploit the pricing mistakes in Appendix 3 to CCT's financial advantage, and to avoid and prevent their correction. (¶¶ 54, 56.) Global Crossing relied upon these representations because the VoIP Bundle was still in a developmental stage, and was not publicly available. Global Crossing still had to resolve technical issues, such as adapting its billing procedures to fit the contours of the product. (¶ 42.) Following the execution of the Amendment, CCT exploited the errors in Appendix 3 by driving over a million minutes of traffic to the Caribbean and mobile destinations in Western European countries, even though CCT had previously stated that its traffic would be limited to the continental United States. (¶ 55.) "In short, CCT (a) sent unprecedented and non-negotiated volumes of telephone traffic to (b) non-negotiated destinations." (¶ 55.)

### 4.      The Global Crossing Response

In a January 10, 2007, Guggino and Vlahos discussed the fact that Caribbean destinations and Western European mobile terminations were not included in the VoIP Bundle, and that Appendix 3 was, therefore, incorrect. Guggino asked CCT to end traffic to these destinations

until the parties could resolve the issues.  (¶ 57.)  Vlahos agreed to temporarily suspend traffic to

the Caribbean but refused to suspend traffic to Western European mobile destinations.  (¶ 57.)

He expressed the view that since CCT was giving up something, Global Crossing should give up

something as well.  (¶ 57.)

Because CCT refused to stop taking advantage of rates that it knew were erroneous, on

January 11, 2007, Swartz faxed a notice to Vlahos that Global Crossing was suspending CCT's

international call capabilities.  (¶ 58.)  The fax included an amendment for CCT to sign to rectify

the situation, but CCT declined to sign it.  (¶ 58.)  As a consequence, Global Crossing sent a

notice of termination to CCT on January 26, 2007, and began the termination process.  (¶ 59.)

CCT filed its chapter 11 case on January 29, 2007 before the termination process was complete,

(¶¶ 60-61), and in light of the proscriptions of 11 U.S.C. § 366, Global Crossing allowed CCT to

resume service.  (¶ 61.)

**5.**    **The Causes of Action**

**a.**    **Fourth Cause of Action**

The Fourth Cause of Action incorporates paragraphs 1 through 59, and asserts that CCT

breached the implied covenant of good faith and fair dealing.  The PAC identifies several acts or

categories of conduct that constitute breaches:  (i) CCT sent unprecedented and non-negotiated

volumes of traffic to (ii) non-negotiated destinations unfairly, unreasonably and beyond the

reasonable expectations of the parties, (¶ 92), (iii) CCT refused to correct the Amendment and

otherwise conduct itself to conform to the parties' expressed intent, (¶ 93), and (iv) post-petition,

CCT continued to send non-negotiated volumes of traffic.  (¶ 94.)

26

New York law implies the covenant of good faith and fair dealing in every contract. Times Mirror Magazines, Inc. v. Field & Stream Licenses Co., 294 F.3d 383, 394 (2d Cir. 2002); Carvel Corp. v. Diversified Mgmt. Group, Inc., 930 F.2d 228, 230 (2d Cir. 1991); Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995).  The covenant encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included," Times Mirror Magazines, 294 F.3d at 394 (citation omitted), "a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract,'" Dalton, 663 N.E.2d at 291 (quoting Kirke La Shelle Co. v. Armstrong Co., 188 N.E. 163, 167 (N.Y. 1933), and "[w]here the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion."  Dalton, 663 N.E.2d at 291 (citation omitted).

The covenant is not boundless.  A duty of good faith cannot be implied that "'would be inconsistent with other terms of the contractual relationship,'" id. at 291-92 (quoting Murphy v. Am. Home Prods. Corp., 448 N.E.2d 86, 91 (N.Y. 1983)); accord Times Mirror Magazines, 294 F.3d at 394, or create independent obligations beyond those set forth in the contract.  Buena Vista Home Entm't, Inc. v. Wachovia Bank, N.A. (In re Musicland Holding Corp.), 386 B.R. 428, 438 (S.D.N.Y. 2008)("The duty of good faith and fair dealing is a tool of interpretation that cannot be used to rewrite a contract and impose new terms."); Warner Theater Assocs. Ltd. P'ship v. Metro. Life Ins. Co., No. 97 Civ. 4914 (SS), 1997 WL 685334 at *6 (S.D.N.Y. Nov. 4, 1997), aff'd in unpublished op., 149 F.3d 134 (2d Cir. 1998); CIBC Bank & Trust Co. Cayman Ltd. v. Banco Cent. Do Brasil, 886 F. Supp. 1105, 1118 (S.D.N.Y. 1995) ("[A]lthough the obligation of good faith is implied in every contract, it is the terms of the contract which govern

27

the rights and obligations of the parties.")(citation omitted); <u>Keene Corp. v. Bogan</u>, No. 88 Civ. 0127(MBM), 1990 WL 1864, at *14 (S.D.N.Y. July 11, 1990)("Courts generally have been reluctant to find a breach of an implied covenant of good faith when doing so reads so much into the contract as to create a new term or when the alleged misconduct is expressly allowed by the contract.").

The Fourth Cause of Action fails to allege a legally sufficient claim.  Appendix 3 clearly and unambiguously listed the destinations that enjoyed the 100% discount and those that did not. The former included the Caribbean and certain international mobile terminations.  In substance, Global Crossing contends that the Court should disregard these unambiguous pricing terms and impose different ones.  If the pricing terms in Appendix 3 were included in error, Global Crossing may be entitled to rescind the Agreement.  But until that happens, the unambiguous terms of the Amendment and Appendix 3 govern the destinations and usage charges.

Global Crossing also asks the Court to imply a limitation on the volume of total traffic that CCT can send.  The Amendment did not contain any limitation, except a technological one. The number of concurrent call sessions that CCT ordered and Global Crossing agreed to provide permitted a significant though finite amount of traffic.  Implying greater restrictions on use would materially alter parties' rights and obligations.

Finally, CCT was not under any express or implied obligation to sign the amendment supplied by Global Crossing in January.

### b.    Fifth Cause of Action

The Fifth Cause of Action seeks reformation based on mutual mistake.  Incorporating the preceding paragraphs 1 through 59, it alleges that Appendix 3 incorrectly included Caribbean

destinations as Zero-Rated Destinations.  (¶ 97.)  In addition, while Appendix 3 correctly included Western European landline destinations as zero-rated, it incorrectly zero-rated Western European terminations to mobile numbers.  (¶ 98.)  These errors resulted from the mutual mistake of the parties.  (See ¶ 96.)

CCT has raised a variety of equitable defenses, which, it contends, preclude reformation as a matter of law.  The Court need not address these arguments here because the Fifth Cause of Action is improperly pleaded.  The PAC alleges that CCT knew that the VoIP Bundle did not include, and the 100% discount did not apply to, the Caribbean destinations, (¶ 48), and upon information and belief, knew or should have known that the same was true for international mobile destinations.  (¶ 50.)  Consequently, and upon information and belief, when Vlahos received Appendix 3, "he knew that Appendix 3 should not have included Caribbean or international mobile destinations as zero-rated."  (¶ 52.)  The Fifth Cause of Action incorporates these allegations.  (¶ 95.)  The averments are utterly inconsistent with the claim that CCT, like Global Crossing, was mistaken.

### c.    Sixth Cause of Action

The Sixth Cause of Action seeks reformation based on Global Crossing's unilateral mistake and CCT's fraudulent inducement.  According to the ad damnum clause, Global Crossing is also seeking rescission.  Global Crossing's mistake presumably refers to the pricing errors in Appendix 3, discussed above.  The fraud claim is based on Vlahos's November 28, 2006 email stating that the coverage area was the 48 continental states (the "Email Fraud"), (¶ 102), and the "other specific representations" made between November 28 and December 20, 2006 (the "Other Fraud"), that it would not take advantage of the incomplete state of the VoIP Bundle offering.  (¶ 103.)  The alleged Other Fraud includes the assurances that CCT would be

fair and reasonable and would not abuse Global Crossing's network through the VoIP Bundle, (¶ 41), and would be fair and reasonable in its use of the services offered under the VoIP Bundle. (¶ 53.)

"In order to prove fraudulent inducement under New York law, a plaintiff must prove (1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury." Computerized Radiological Servs. v. Syntex Corp., 786 F.2d 72, 76 (2d Cir. 1986) (citations omitted). Federal Civil Rule 9(b) requires the plaintiff to plead fraud with particularity. [20] The complaint "must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).

Although scienter may be pleaded generally, the pleader must "allege facts that give rise to a strong inference of fraudulent intent." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). A strong inference of fraudulent intent may be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Id. at 1128; accord ATSI Commc'ns, 493 F.3d at 99. To qualify as "strong," "the inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent

---

[20]     Rule 9(b) states:

(b) FRAUD OR MISTAKE; CONDITIONS OF MIND. In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

and compelling, thus strong in light of the other explanations." <u>Tellabs</u>, 127 S. Ct at 2510.  The

court must consider the inferences urged by the plaintiff and the competing inferences rationally

drawn from the facts alleged.  <u>Id</u>. at 2509-10.  "A complaint will survive, we hold, only if a

reasonable person would deem the inference of scienter cogent and at least as compelling as any

opposing inference one could draw from the facts alleged."  <u>Id</u>.

### i)    Email Fraud

The allegations of Email Fraud are legally insufficient.  First, Global Crossing fails to

allege a knowing misrepresentation.  Global Crossing asked Vlahos what CCT would like a

document to include, and he responded "[t]he coverage area is defined as 100% continental 48

states."  (¶ 40.)  Global Crossing does not contend that Vlahos lied when he said he wanted the

"document" to say this.

Second, to the extent this is an implied representation that CCT intended to limit the

traffic to the continental United States, Global Crossing has failed to allege facts giving rise to a

strong inference of fraudulent intent.  In particular, Vlahos had no motive to lie, at least about the

Western European landline destinations.  They were zero-rated under the VoIP Bundle.  If CCT

intended to send this traffic over the Global Crossing network, Vlahos presumably would have

said so in response to Global Crossing's November 28, 2006 email.

Third, the conclusory allegations of reliance are belied by specific allegations of fact.

Despite Vlahos's implied representation to limit coverage to the continental 48 states, Appendix

3, which Global Crossing prepared, included Zero-Rated Destinations in the Caribbean and

international mobile terminations.  Global Crossing's reliance theory rests on the implausible

notion that it included this coverage only because CCT convinced it that CCT would never use it.

### ii)      Other Fraud

The allegations of "Other Fraud" are even more tenuous, and also fail to satisfy Federal Civil Rule 9(b).  Global Crossing did not identify the misrepresentations, but merely alluded to them.  The PAC refers to assurances and other "specific representations" to the effect that CCT would be fair and reasonable and not take advantage of the VoIP Bundle.  The PAC fails to set forth those misstatements or the circumstances under which they were made.  In addition, the PAC alleges that they were made between November 28th and December 20th.  Global Crossing signed the Amendment on December 13th, and could not have relied on any statement made on or after December 14th when it executed the Amendment.

### iii)     Reformation

"A party seeking reformation of a contract by reason of mistake must establish, with clear and convincing evidence, that the contract was executed under mutual mistake or a unilateral mistake induced by the other party's fraudulent misrepresentation."  Yu Han Young v. Chiu, 853 N.Y.S.2d 575, 576 (N.Y. App. Div. 2008); accord M.S.B. Devel. Co. v. Lopes, 832 N.Y.S.2d 95, 96 (N.Y. App. Div. 2007).  "A bare claim of unilateral mistake by plaintiff, unsupported by legally sufficient allegations of fraud on the part of defendants, does not state a cause of action for reformation."  Barclay Arms, Inc. v. Barclay Arms Assocs., 540 N.E.2d 707, 708-09 (N.Y. 1989).  The Sixth Cause of Action incorporates paragraphs 1 through 59, (¶ 100), and fails to allege a mutual mistake for the reasons stated in connection with the Fifth Cause of Action.  In addition, the allegations of fraud are legally insufficient.  Accordingly, the Sixth Cause of Action fails to state a claim for reformation.

### iv)    Rescission

CCT does not discuss the elements of a rescission claim, and as a result, I do not read its opposition to challenge the facial sufficiency of the proposed pleading.[21]   Rather, CCT argues that Global Crossing's rescission claim is barred by a host of equitable defenses, including lack of diligence, ratification, the adequacy of legal remedies, and unclean hands.   The Court cannot conclude, as a matter of law, that Global Crossing was not diligent.   It could not have learned of the fraud or mistake until the parties signed the amendment in mid-December 2006.   When it did, it asked CCT to execute a second amendment, but CCT declined.[22]   In late January 2007, CCT filed this chapter 11, and since Day One, Global Crossing has argued that the contract was already terminated, or could be terminated.   Nevertheless, the automatic stay prevented it from terminating the contract, and § 366 required it to continue to provide telecommunications service, at least for a while.   Under the circumstances, the claim is not barred by reason of lack of diligence in asserting fraud or mistake.   For similar reasons, the facts do not mandate the conclusion that Global Crossing ratified the contract.

CCT also maintains that Global Crossing is not entitled to rescission because it has an adequate remedy at law.   See Mina Inv. Holdings Ltd. v. Lefkowitz, 184 F.R.D. 245, 258 (S.D.N.Y. 1999)("[R]escission is not available where a plaintiff has an adequate remedy at law."); Brooks v. Key Trust Co. Nat. Ass'n, 809 N.Y.S.2d 270, 273 (N.Y. App. Div. 2006)("Since plaintiff has 'a complete and adequate remedy at law, [citation omitted] pursuant to his breach of contract cause of action, dismissal of this rescission claim was warranted [citation

---

[21]        CCT argues that the PAC fails to allege mistake with particularity.   The nature of the pricing mistake is, however, repeated throughout the pleading.

[22]        I do not mean to imply that CCT improperly refused to sign the proposed amendment.

omitted]." ).  According to CCT, damages will fully compensate Global Crossing if it prevails.  It can recover the difference between the rates called for under Appendix 3 and the rates that Global Crossing contends it was entitled to charge after it modified them.

I cannot conclude that the legal remedy suggested by CCT would be adequate.  Appendix 3 requires Global Crossing to provide services, at no additional usage charge, to the Caribbean destinations and international mobile terminations.  Unless the Agreement is rescinded, it must continue to do so, and has no claim for damages.  The only way that Global Crossing can extricate itself from what it views as an uneconomic deal is to rescind the Agreement.

Finally, CCT contends that unclean hands bars Global Crossing's equitable remedy of rescission.  See Tepfer v. Berger, 501 N.Y.S.2d 106, 107 (N.Y. App. Div. 1986); Pecorella v. Greater Buffalo Press, Inc., 486 N.Y.S.2d 562, 563 (N.Y. App. Div. 1985).  Global Crossing concedes that the VoIP Bundle included the Western European landline destinations as Zero-Rated Destinations.  (¶ 49.)  When CCT refused to sign the amendment proffered by Global Crossing in January 2007, Global Crossing unilaterally terminated all international service, (¶ 58), which included Western European landline destinations.  Hence, the PAC acknowledges that Global Crossing failed to provide services that were never in dispute.  In addition, CCT maintains that blocking its international traffic violated federal telecommunications law.

Notwithstanding Global Crossing's actions, the doctrine of unclean hands does not bar the rescission claim, at least as a matter of law.  The cases cited by CCT generally support the proposition that one who commits a material breach of a contract cannot sue to enforce the contract for its benefit.  See Cornell v. T. V. Dev. Corp., 215 N.E.2d 349, 352 (N.Y. 1966)("[A] covenant [against competition] is valid and enforcible, but not when the party benefited was

responsible for the breach of the contract containing the covenant."); <u>see</u> 55 N.Y. Jur. 2d, <u>Equity</u> § 115, at p. 703 (2002)("A party to a contract who fails to perform a material obligation of the contract is not in court with clean hands and may not seek the aid of a court of equity in protection of alleged rights arising out of or connected with the contract.")(footnote omitted).

Here, Global Crossing is seeking to rescind the Agreement, not enforce it.  In addition, CCT's argument assumes that every breach of contract renders the breaching party's hands unclean.  If correct, a breaching party could never counterclaim for rescission.  This, however, does not appear to be the law.  <u>See</u> <u>Mercantile & General Reinsurance Co. v. Colonial Assurance Co.</u>, 624 N.E.2d 629, 630 (N.Y. 1993)(action for rescission was equitable defense and counterclaim to claim for breach of contract).  Accordingly, the claim for rescission, based upon unilateral mistake, will not be dismissed.[23]

### d.    Seventh Cause of Action

The Seventh Cause of Action asserts a damage claim based on the same fraud that supported the reformation and rescission claims.  For the reasons already discussed, the fraud allegations are legally insufficient, and the "Other Fraud" allegations also fail to satisfy the requirements of Federal Civil Rule 9(b).

In conclusion, the motion for leave to amend is granted with respect to the First, Second and Third Causes of Action, and so much of the Sixth Cause of Action as asserts a claim for rescission.  It is otherwise denied.  Global Crossing shall serve and file its amended complaint

---

[23]     Global Crossing's reply attempted to bolster the rescission claim (and counter the unclean hands defense) by arguing that rescission is appropriate where the other party has committed a substantial breach. (<u>Plaintiff's Reply in Further Support of Motion to Amend</u>, at ¶¶ 32, 34-35. (ECF/AP Doc. # 48).) Although the PAC alleges that CCT breached the resale provisions incorporated into the RCA, Global Crossing did not rely on this alleged breach to block the calls to the Western European landlines.  (<u>See</u> PX 11.)

within ten days, and the parties are directed to contact chambers to schedule a conference.

CCT's motion to strike Global Crossing's amended reply is denied as moot.  Settle order.


Dated: New York, New York
     July 2, 2008



                    /s/ *Stuart M. Bernstein*
                    STUART M. BERNSTEIN
          Chief United States Bankruptcy Judge