UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

In re:                                                      :

                                                            :        Chapter 11 (Dismissed)

CCT COMMUNICATIONS, INC.,                                   :

                                                            :        Case No. 07-10210 (SMB)

                              Former Debtor.                :

---------------------------------------------------------------------x

GLOBAL CROSSING                                             :
TELECOMMUNICATIONS, INC.,                                   :
                                                            :
                              Plaintiff,                    :
                                                            :
       —against—                                           :        Adv. Proc. No. 07-1942
                                                            :
CCT COMMUNICATIONS, INC.,                                   :
                                                            :
                              Defendant.                    :

---------------------------------------------------------------------x

## MEMORANDUM DECISION AND ORDER
## GRANTING IN PART AND DENYING IN PART
## MOTION FOR PARTIAL SUMMARY JUDGMENT

**A P P E A R A N C E S :**

LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834

>       Robert J. Rosenberg, Esq.
>       James Brandt, Esq.
>       John D. Castiglione, Esq.
>       Elizabeth R. Marks, Esq.
>               Of Counsel

– and –

DRUMMOND WOODSUM & MACMAHON
84 Marginal Way, Suite 600
Portland, Maine 04101-2480

>       George Royle V, Esq.
>               Of Counsel

*Attorneys for Plaintiff Global Crossing
    Telecommunications, Inc.*

ZANE D. SMITH & ASSOCIATES, LTD.
415 North LaSalle Street, Suite 501
  Chicago, Illinois 60654

    James A. Karamanis, Esq.
      Of Counsel

*Attorneys for CCT Communications, Inc.*

**STUART M. BERNSTEIN**
**UNITED STATES BANKRUPTCY JUDGE**

This litigation arises out of series of agreements under which the plaintiff, Global

Crossing Telecommunications, Inc. ("Global Crossing"), agreed to provide telecommunications

services to the defendant, CCT Telecommunications, Inc. ("CCT"). CCT resold the services to

third parties.

After Global Crossing stopped providing some of the services, it commenced this

adversary proceeding primarily seeking declaratory relief, and CCT eventually counterclaimed,

*inter alia*, for damages arising from Global Crossing's alleged breach of contract and its

violations of the Federal Communications Act of 1934, as amended, 47 U.S.C. §§ 151 *et seq.*

(the "Communications Act").

Global Crossing has now moved for partial summary judgment. The motion presents two

questions: is the limitation on liability in the parties' contract enforceable, and if it is, what is the

scope of the limitation? On the first point, the Court concludes that the clause is enforceable

with respect to all state law and Communications Act damage claims. On the second, the Court

concludes that while the clause plainly bars consequential damages, its full reach cannot be

determined as a matter of law.

2

## BACKGROUND

Unless otherwise noted, the material facts concerning the motion are not in dispute.  In addition, the Court has already conducted a trial of certain of the claims asserted by the parties, and in connection with that trial, made findings of fact and conclusions of law.  *See Global Crossing Telecomm., Inc. v. CCT Commc'ns, Inc. (In re CCT Commc'ns)*, Adv. Proc. No. 07-1942, 2008 WL 2705471 (Bankr. S.D.N.Y. July 2, 2008) ("*CCT Commc'ns*").  The background discussion, which is primarily based in those findings, is limited to that necessary to understand this decision.

### A.    The Parties' Contract

At all relevant times, Global Crossing was a common carrier engaged in the business of providing telecommunications services.  CCT was also a common carrier engaged in the business of buying and reselling telecommunications services.  The parties' business relationship began in 2005, and expanded in 2006 when they signed the "Retail Customer Agreement" or RCA.[1]  Under the RCA, Global Crossing levied a "per minute" usage charge based on the origin or destination of a call.  The services were limited to the 50 states, the RCA ran for three years, and obligated CCT to pay a monthly usage guarantee, or MUG, of $60,000.  Importantly, the RCA contained a clause (§ 6.2) limiting the types of damages that either party could recover from the other:

> **Exclusion of Consequential Loss**.  In no circumstances shall either we or you be liable for indirect, consequential, reliance, or special loss or damages or for lost revenues, lost savings, lost business opportunity or lost profits of any kind.

In December 2006, and after substantial negotiations, the parties executed an amendment to the RCA (the "Amendment").  Global Crossing agreed to provide services to CCT under its

---

[1]    CCT signed the RCA on April 1, 2006, and Global Crossing signed on June 29, 2006.

3

"All You Can Eat," or AYCE program, which is discussed at length in *CCT Commc'ns*, 2008 WL 2705471, at *2–3. Briefly, Global Crossing charged a flat monthly fee in lieu of "per minute" usage charges for certain landline and mobile calls terminating in specific geographic areas (the "Zero-Rated Destinations"), including Europe and the Caribbean. The Amendment included a 26-page schedule (Appendix 3) which set forth the rates—zero or some other rate— that Global Crossing would charge CCT for calls terminating at a particular destination. In other words, the flat monthly fee covered certain destinations while a per-minute usage charge applied to others.

In addition to the Amendment, the parties also prepared and signed a series of four order forms to implement the AYCE pricing. The first two entitled CCT to purchase 1,344 concurrent call sessions at a monthly recurring charge of $71 per session, or a total of $95,424 per month (plus taxes and fees). The second set of orders entitled CCT to purchase an additional 2,016 concurrent call sessions for a monthly recurring charge of $71 per session, or a total of $143,136 per month (plus taxes and fees). Each order ran for three years.

The Amendment did not affect § 6.2.

## B.     Global Crossing Blocks CCT's Service

Soon after the Amendment was executed, CCT began sending a volume of international calls over Global Crossing's network to zero-rated international mobile destinations, which resulted in Global Crossing incurring relatively high termination costs that it had to "eat" under the AYCE and could not pass on to CCT. Global Crossing became concerned that providing service to CCT under the AYCE plan was too costly, and looked for ways to shut down CCT's international traffic.

4

On or about January 10, 2007, Global Crossing sent Dean Vlahos, CCT's president, a proposed contract amendment. The amendment would have eliminated all mobile international calling areas and all calling areas in the Caribbean from the scope of the AYCE pricing plan without reducing the monthly recurring charges. Vlahos declined to sign it.

The next day, January 11th, Glenn Swartz, Global Crossing's Director of Credit and Collections, sent CCT a letter. (*Declaration of Dean S. Vlahos*, dated Feb. 26, 2011 ("*Vlahos Decl.*"), Ex. 17 (ECF Doc. # 228).)[2] The letter stated that CCT's "calling pattern does not meet the standard profile," and Global Crossing decided it had to change CCT's rate structure or terminate service. Because CCT refused to sign the proposed amendment (although CCT had supposedly agreed orally to discontinue and/or redirect all Caribbean international traffic and give further consideration to redirecting all international traffic), Global Crossing had "blocked international capabilities" and would continue doing so "until such time that CCT returned the executed Amendment." The penultimate paragraph added that CCT had exceeded the credit limit granted by Global Crossing, and gave CCT notice that its services were subject to full termination at noon, EST, on January 25, 2007. The final paragraph concluded that Global Crossing was open to a mutual resolution to avoid the full termination of CCT's services and welcomed the opportunity to discuss the matter.

Vlahos responded by e-mail later that day. (*See Vlahos Decl.*, Ex. 18.) He disputed that CCT had exceeded its credit limit, emphasized that the Amendment provided for a fixed monthly fee, and asserted that nothing in the RCA allowed Global Crossing to terminate based on its net costs. Nevertheless, as a gesture of CCT's good faith, Vlahos stated that he might agree to voluntarily suspend international calling outside of the Caribbean while CCT attempted to

---

[2]      All citations to the ECF refer to this adversary proceeding.

resolve any issues with Global Crossing, provided that all parties acted in good faith. Otherwise, the disputes would be resolved through litigation.

Vlahos never signed the proposed amendment, the parties failed to reach an accord, and Global Crossing completed blocking CCT's international call termination capabilities, except for calls to Canada, on or about January 17, 2007. On or about January 26, 2007, Global Crossing sent a letter to Vlahos purporting to terminate the Agreement, this time asserting that CCT's resale of Enterprise VoIP Local Service "constitutes a material breach" of the parties' contract. Before Global Crossing could actually terminate all of the services, CCT commenced its chapter 11 case on January 28, 2007.

## C.    This Adversary Proceeding

Global Crossing eventually commenced this adversary proceeding seeking declaratory relief, and CCT counterclaimed, *inter alia*, for breach of contract and violations of the Bankruptcy Code and the Communications Act.[3]

The Communications Act claims sought damages under 47 U.S.C. § 206.[4] (*Answer, Affirmative Defenses, and Counterclaims of Defendant-Counterclaimant CCT Communications, Inc. to Second Amended Complaint*, dated Mar. 22, 2010 ("*Answer*") (ECF Doc. # 161).) Count II alleged that Global Crossing's blocking, throttling and/or choking CCT's telephone call traffic

---

[3]    The Court subsequently dismissed the chapter 11 case but retained jurisdiction over this adversary proceeding.

[4]    Section 206 states that a common carrier that violates the Communications Act "shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case." 47 U.S.C. § 206.

6

were unjust and unreasonable practices under 47 U.S.C. § 201(b)[5] and, along with Global

Crossing's failure to furnish service to CCT under CCT's orders for AYCE services and/or

pricing, constituted the failure to furnish service upon reasonable request under 47 U.S.C. §

201(a).[6]  (*Answer* ¶¶ 39–40.)  Count III alleged that the prohibitions on resale, including the

technical interconnection requirements imposed by Global Crossing on end-users, violated 47

U.S.C. §§ 201(a), 201(b), 202(a)[7] and 251(b)(1).[8]  (*Answer* ¶¶ 49–50.)

These counts are not at issue on this motion, but a related claim, Count VII, is.  In Count

VII, CCT sought declaratory relief that § 6.2 of the RCA did not limit the damages it was

seeking under the Communications Act and New York law.  (*Answer* ¶ 67.)  CCT made two,

alternative arguments.  First, CCT alleged that § 6.2 was "invalid and unenforceable under the

Communications Act because it is unjust and unreasonable and contains no exception for

---

[5]    Section 201 provides, in pertinent part:

   (a)  It shall be the duty of every common carrier engaged in interstate or foreign communication
   by wire or radio to furnish such communication service upon reasonable request therefor. . . .

   (b) All charges, practices, classifications, and regulations for and in connection with such
   communication service, shall be just and reasonable, and any such charge, practice, classification,
   or regulation that is unjust or unreasonable is declared to be unlawful. . . . .

[6]    Count IV alleged that Global Crossing's blocking, throttling and/or choking of traffic, and its refusal to
furnish service upon reasonable request, also violated 47 U.S.C. § 406.  This section grants the district court
jurisdiction to issue a writ of mandamus compelling a common carrier that has violated another provision of the
Communications Act to provide wire or radio service upon appropriate terms.  It does not provide for damages.
Furthermore, the contract for services between the parties has expired, and the request for mandamus relief may,
therefore, be moot.

[7]    Section 202(a) states:

   It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges,
   practices, classifications, regulations, facilities, or services for or in connection with like communication
   service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable
   preference or advantage to any particular person, class of persons, or locality, or to subject any particular
   person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

[8]    Section 251(b)(1) imposes a duty "not to prohibit, and not to impose unreasonable or discriminatory
conditions or limitations on, the resale of its telecommunications services."

liability arising from violations of the Communications Act, and therefore conflicts with 47

U.S.C. § 206." (*Answer* ¶ 70.)  Second, CCT argued that Global Crossing's breaches of contract

and violations of the Communications Act constituted "willful, intentional or reckless

misconduct, gross negligence, intentional wrongdoing, or bad faith." (*Answer* ¶ 72.)  As a result,

§ 6.2 was unenforceable under the Communications Act and New York law and should be

severed from the RCA because it did not exclude, among other things, willful misconduct and

gross negligence. (*Answer* ¶¶ 73–75.)

Global Crossing moved for partial summary judgment on the issue of damages, directly

drawing Count VII into question.  Focusing on the report submitted by CCT's damage expert,

Stephen E. Siwek (the "Siwek Report"), which advanced two theories of damages, Global

Crossing argued that § 6.2 barred recovery.  In fact, Global Crossing seemed to contend that §

6.2 limited CCT to the recovery of restitution damages—services paid for by CCT but not

delivered by Global Crossing. (*Global Crossing Telecommunications, Inc.'s Memorandum of*

*Law in Support of Motion for Summary Judgment on Damages*, dated Jan. 14, 2011 ("*Global*

*Crossing Memo*"), at 2 n.1 (ECF Doc. # 200).)

CCT's opposition tracked the allegations in Count VII.  It argued that § 6.2 cannot limit

damages for liability imposed under 47 U.S.C. § 206 based on the breach of the statutory duty to

furnish telecommunications services.  Similarly, New York law prohibited a common carrier

from limiting its liability for its breach of contract resulting from willful misconduct or gross

negligence.  CCT further argued that § 6.2 was unenforceable because it failed to expressly

exclude willful misconduct and gross negligence from its scope, and should be severed from the

RCA.  Alternatively, CCT maintained that even if § 6.2 was enforceable, it did not bar CCT's

damages because Global Crossing was guilty of willful misconduct as a matter of law.  Finally, §

6.2 did not bar the ordinary contract remedy that permits the non-breaching party to recover damages measured by the "benefit of the bargain."[9]

## DISCUSSION

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by FED. R. BANKR. P. 7056, governs summary judgment motions. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).[10] The moving party bears the initial burden of showing that the undisputed facts entitle him to judgment as a matter of law. *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995). If the movant carries this initial burden, the nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In deciding whether material factual issues exist, all ambiguities must be resolved and all inferences must be drawn in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587.

---

[9] CCT filed its opposition and made a cross-motion for summary judgment after the deadline agreed to by the parties. Global Crossing moved to default CCT or preclude it from opposing Global Crossing's motion. I declined to consider CCT's tardy cross-motion, and reserved decision on the balance of Global Crossing's motion. The motion is denied for the reasons stated in a separate opinion that is being issued simultaneously with this one.

[10] Global Crossing's motion is governed by the version of Rule 56 that became effective on December 1, 2010. Although some language that appeared in the prior version changed, the standard for granting summary judgment remains unchanged and the amendments will not "affect continuing development of the decisional law construing and applying these phrases." FED. R. CIV. P. 56 advisory committee's note (2010).

A.      **The Enforceability of § 6.2 Under New York Law**

The interpretation of the RCA is governed by New York law.  (*RCA* ¶ 15.)  Under New York law, contractual clauses limiting liability reflect the parties' allocation of risks and are generally enforceable.

> A limitation on liability provision in a contract represents the parties' Agreement on the allocation of risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor. . . . [The parties] may later regret their assumption of the risks of non-performance in this manner; but the courts let them lie on the bed they made.

*Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504, 507 (N.Y. 1994) ("*Metropolitan Life I*") (quoting 5 CORBIN, CORBIN ON CONTRACTS § 1068, at 386 (1964)); *accord Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 450 (S.D.N.Y. 2003); *see Baidu, Inc. v. Register.com, Inc.*, No. 10 Civ. 444 (DC), 2010 WL 2900313, at *4 (S.D.N.Y. July 22, 2010) (Chin, C.J.) ("Contractual provisions that 'clearly, directly and absolutely' limit liability for 'any act or omission' are enforceable, 'especially when entered into at arm's length by sophisticated contracting parties.'") (quoting *Kalisch-Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 416 (N.Y. 1983)); *DynCorp. v. GTE Corp.*, 215 F. Supp. 2d 308, 317 (S.D.N.Y. 2002) ("Under New York law, sophisticated parties with equal bargaining power can agree to limit the liability that the other may recover from a breach of contract.").

This rule is subject to an exception imposed by public policy.  New York law prohibits parties from limiting their liability for gross negligence or willful misconduct.  *Kalisch-Jarcho*, 448 N.E.2d at 416 ("[A]n exculpatory agreement . . . will not exonerate a party from liability under all circumstances. . . .  [I]t will not apply to exemption of willful or grossly negligent acts.") (citations omitted); *see Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1370 (N.Y. 1992) ("It is the public policy of this State . . . that a party may not insulate itself from damages caused

10

by grossly negligent conduct."); 103 N.Y. JUR. 2D TELECOMMUNICATIONS § 104, at 231 (2005)

("Although a telephone corporation may not by contract absolutely exempt itself from liability

for its negligence, it may file tariffs with the Public Service Commission which provide that no

liability will attach to it in the absence of gross negligence or willful misconduct.") (footnotes

omitted).  Gross negligence means "conduct that evinces a reckless disregard for the rights of

others or 'smacks' of intentional wrongdoing." *Colnaghi, U.S.A., Ltd. v. Jewelers Protection

Servs., Ltd.*, 611 N.E.2d 282, 284 (N.Y. 1993); *accord Am. Tel. & Tel. Co. v. City of New York*,

83 F.3d 549, 556 (2d Cir. 1996).  "Willful misconduct" in this context requires tortious intent,

such as fraud, malice, a dishonest purpose or bad faith. *Kalisch-Jarcho, Inc.*, 448 N.E.2d at 416–

17; *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 600 N.Y.S.2d 212, 216 (N.Y. App.

Div. 1993) ("*Metropolitan Life II*") ("'Willful' is a term of tort, not contract [and] is synonymous

with 'wanton' and 'reckless.'"), *aff'd*, 643 N.E.2d 504 (N.Y. 1994).

Importantly, willful misconduct does not include the voluntary and intentional failure or

refusal to perform a contract for economic reasons.  In *Metropolitan Life*, the defendant agreed to

provide computer software and computer-related services to the plaintiff.  643 N.E.2d at 505.

Their contract included a limitation of liability clause which stated that "[i]n no event shall

[plaintiff] be liable for any lost profits, lost savings or other consequential damages," and

absolved the defendant from liability for "loss of profit, loss of business, or other financial loss

resulting from [defendant's] performance or nonperformance." *Id.* at 505–06.  The limitation did

not apply to "intentional misrepresentations, or damages arising out of [defendant's] willful acts

or gross negligence." *Id.* at 506 (emphasis omitted).

After supplying the base system, the defendant demanded an upward adjustment of the

contract price for certain enhancements, the plaintiff refused to pay it and the defendant

11

discontinued further performance. *Id.* The plaintiff sued seeking a refund of the sums paid plus

general and consequential damages, and the defendant asserted the limitation of damages clause

as a partial affirmative defense. *Id.* At trial, the jury made a special finding that the defendant's

acts were willful, and awarded nearly $4 million in damages. *Id.* On appeal, the Appellate

Division reduced the damages to $204,000, reflecting only the compensation for the work

actually performed. *Metropolitan Life II*, 600 N.Y.S.2d at 218. The Appellate Division equated

willfulness with tortious conduct, concluding that "an omission to perform a contract obligation

is never a tort, unless the omission is also the omission of a legal duty." *Id.* at 216 (internal

quotation marks and citation omitted).

On further appeal, the New York Court of Appeals emphasized that the issue was

whether the defendant's breach was "willful" within the meaning of the clause limiting liability

rather than under tort law. Nevertheless, the court reached the same result as the Appellate

Division. Construing the parties' agreement as a whole, it ruled that the term "willful" was

intended by the parties to subsume "conduct which is tortious in nature, *i.e.*, wrongful conduct in

which defendant willfully intends to inflict harm on plaintiff at least in part through the means of

breaching the contract between the parties." *Metropolitan Life I*, 643 N.E.2d at 508. The

plaintiff had failed to prove willful misconduct because the defendant had acted out of economic

self-interest:

> [T]he proof, as plaintiff has indeed stressed, was that defendant's repudiation of
> the Agreement was motivated exclusively by its own economic self-interest in
> divesting itself of a highly unprofitable business undertaking in order to promote
> the sale of its computer software division to a competitor company.

*Id.* at 509. Although *Metropolitan Life I* interpreted the meaning of "willful" as a contract term,

it emphasized that its interpretation was consistent with the public policy exception announced in

*Kalisch-Jarcho* and *Sommer v. Federal Signal Corp. Id.*

12

*Berner v. British Commonwealth Pac. Airlines, Ltd.*, 346 F.2d 532 (2d Cir. 1965), cited

by CCT in support of a different definition of "willful," is inapposite. *Berner* involved an air

crash, and concerned the limitation of liability under the Warsaw Convention that excluded

"willful misconduct" from the scope of the limitation. The Court of Appeals held that "willful

misconduct" included "the intentional performance of an act with knowledge that the

performance of that act will probably result in injury or damage," or "the intentional omission of

some act, with knowledge that such omission will probably result in damage or injury." *Id*. at

536–37 (quoting *Pekelis v. Transcont'l & W. Air, Inc.*, 187 F.2d 122, 124 (2d Cir. 1951), *cert.*

*denied*, 341 U.S. 951 (1951)) (emphasis omitted). Although the Warsaw Convention definition

is sufficient to encompass the intentional non-performance of a contractual duty for economic

reasons, *Cohen v. Varig Airlines (S.A. Empresa de Viacao Aerea Rio Grandense)*, 405 N.Y.S.2d

44, 50 (N.Y. App. Div. 1978) ("Varig's callous disregard for plaintiffs' plight and wilful

renunciation of its contractual obligation to its passengers was motivated by selfish economic

interest and justifies a finding of wilful misconduct under the provisions of the Warsaw

Convention."), it is inconsistent with the New York definition of "willful" misconduct as applied

to the public policy exception regarding limitation on liability clauses.[11]

---

[11]    *Staton Holdings, Inc. v. MCI WorldCom Commc'ns, Inc.*, 25 F.C.C.R. 5094 (2010), which referenced the
*Berner* definition, *see id.* ¶ 16 n.44, was not interpreting New York law.

        CCT also cites several lower court telecommunications cases that, it maintains, demonstrate that
willful misconduct and gross negligence include the carrier's unexplained or unjustified failure to furnish service or
the discontinuance or interruption of existing service. (*CCT Communications Inc.'s Memorandum of Law in
Support of CCT's Cross Motion for Partial Summary Judgment on Global Crossing's Ninth Affirmative Defense and
Count VII of CCT's Counterclaims and in Opposition to Global Crossing's Summary Judgment Motion on
Damages*, dated Feb. 26, 2011 ("*CCT Opposition*"), at 25–26 (ECF Doc. #226).) These cases are distinguishable,
primarily involving the negligent or inadvertent failure to provide telephone service, *e.g.*, *Held v. New York Tel. Co.*,
342 N.Y.S.2d 665 (N.Y. Civ. Ct. 1973); *Warren v. New York Tel. Co.*, 324 N.Y.S.2d 243 (N.Y. Civ. Ct. 1971);
*Babitt v. New York Tel. Co.*, 313 N.Y.S.2d 496 (N.Y. Civ. Ct. 1970), or deliver a telegraph message. *E. g., Freschen
v. W. Union Tel. Co.* 189 N.Y.S.2d 649 (N.Y. Civ. Ct. 1921); *Mowry v. W. Union Tel. Co.*, 4 N.Y.S. 666 (N.Y. Sup.
Ct. 1889). None of the cases involved an economically motivated termination or interruption of service. *Mortenson
v. New York Tel. Co.*, 38 N.Y.S.2d 949 (N.Y. App. Div. 1942), *aff'g* 32 N.Y.S.2d 488 (N.Y. City Ct. 1941),

Here, § 6.2 does not include the public policy exception discussed above, and CCT

argues that this omission renders § 6.2 invalid.  It is clear, however, that a court will imply the

willful misconduct/gross negligence public policy exception even when the exculpatory clause at

issue fails to mention it, and enforce the limitation as implicitly modified in accordance with

*Metropolitan Life I*'s definition.  *See Tradex Europe SPRL*, No. Civ. 1760 (KMW) (FM), 2008

WL 1990464, at *4 (S.D.N.Y. May 7, 2008) (enforcing broad clause limiting liability where

defendant's decision to suspend plaintiff's consulting activities did "not constitute the sort of

'egregious intentional misbehavior' that would invalidate the damages limitation provisions in

the parties' consultancy agreements."); *Deutsche Lufthansa AG v. Boeing Co.*, No. 06 Civ. 7667

(LBS), 2007 WL 403301, at *4 (S.D.N.Y. Feb. 2, 2007) (enforcing a broadly-drafted provision

without express exclusions for gross negligence or willful misconduct, because the defendant's

conduct fell "well below the levels required by the New York courts to invalidate a mutually

agreed upon limitation of liability."); *Net2Globe Int'l*, 273 F. Supp. 2d at 451 (enforcing a

broadly-drafted limitation of liability without express exclusions for gross negligence or willful

misconduct, because the defendant's decision to reroute the plaintiff's telecommunications

traffic and mitigate costs was an "economically motivated decision [that] cannot, as a matter of

law, rise to the level of malice or intentional wrongdoing necessary to invalidate the contracts'

limitation on liability provision."); *cf. Graphic Scanning Corp. v. Citibank, N.A.*, 499 N.Y.S.2d

712, 715 (N.Y. App. Div. 1986) ("In light of the public policy against the enforcement of

---

concerned the termination of service based upon the erroneous belief that the plaintiff had not paid his phone bill.
Finally, *Balaber-Strauss v. New York Tel. (In re Coin Phones)*, 203 B.R. 184 (Bankr. S.D.N.Y. 1996), involved a
series of reckless if not malicious acts directed at the debtor, including the negligent misrepresentation of the amount
owed by debtor for telephone service, the threat to terminate service based on the negligent computation of the
debtor's bill in violation of the substantive and procedural requirements of its tariffs, the failure to implement call-
blocking to eliminate certain long distance charges and the post-petition interruption of service in violation of the
automatic stay.  *Id.* at 212–14.  The court concluded, without reference to *Metropolitan Life I* or a discussion of the
scope of the public policy exception, that the defendant had engaged in willful misconduct and acted with gross
negligence.

exculpatory clauses absolving a party of all liability, no matter how egregious its conduct, the courts have implied an exclusion for willful conduct or gross negligence where the limitation fails specifically to provide for such an exception.").[12]

CCT also maintains that whatever the general rule, New York law does not allow a common carrier such as Global Crossing to limit its liability for breach of a statutory duty. CCT's principal support is *Emery v. Rochester Tel. Corp.*, 282 N.Y.S. 280 (N.Y. Sup. Ct. 1935), *aff'd*, 286 N.Y.S. 439 (N.Y. App. Div. 1935), *rev'd*, 3 N.E.2d 434 (N.Y. 1936). There, the defendant provided telephone service to the plaintiff's household. The plaintiff's daughter fell ill, but the plaintiff was unable to contact the daughter's physician due to the allegedly negligent telephone service provided by the defendant. The daughter died, and the plaintiff sued the defendant as her personal representative. The defendant contended that the claim was barred by a provision in its tariff limiting liability for failure to provide service. 3 N.E.2d at 435. The state supreme court concluded that because New York Public Service Law § 93 imposed liability on the defendant arising from the negligent performance of its duties, the exemption in the tariff was contrary to the public policy of New York, and was void. 282 N.Y.S. at 281.

The Appellate Division affirmed without opinion, 286 N.Y.S. 439, but the Court of Appeals reversed, concluding that the plaintiff had failed to state a cause of action under the Decedent Estate Law. *See* 3 N.E.2d at 436. Addressing the limitation on liability, the Court of Appeals added:

---

[12]   Implying the public policy exception also disposes of CCT's argument that I must sever the entire § 6.2 from the RCA. A severability clause is not implicated if the court interprets the "offensive" contract clause consistent with applicable law and does not invalidate it. *See Ragone v. Atlantic Video at Manhattan Center*, 595 F.3d 115, 123 (2d Cir. 2010). In any event, CCT's severability argument is academic. In the absence of willful misconduct (or gross negligence), the § 6.2 is enforceable as written. If, on the other hand, Global Crossing acted willfully or was grossly negligent, the limitation does not apply without regard to severability.

> As to the validity of the defense of limitation of liability, we express no opinion. That defense is to be deemed an adequate answer to this insufficient complaint. *Baxter v. McDonnell*, 155 N.Y. 83, 100, 49 N.E. 667, 40 L.R.A. 670.

3 N.E.2d at 436. In the case cited by the *Emery* court, *Baxter v. McDonnell*, the Court of Appeals ruled that when a complaint fails to state a cause of action, a "defense pleaded in the answer is sufficient, for, when the complaint is defective, the answer is not demurrable." *Baxter v. McDonnell* 49 N.E. 667, 671 (N.Y. 1898) (citing *Baxter v. McDonnell*, 48 N.E. 816, 817 (N.Y. 1897)). In other words, if the complaint is legally insufficient, the legal sufficiency of a defense "cannot be considered." 48 N.E. at 817.

The reversal of *Emery* by the Court of Appeals, and its conclusion that the lower court should not have considered the legal sufficiency of the limitation of liability defense, undercut the precedential force of the lower court's opinion. More to the point, the principle that CCT draws from the lower court's conclusion is contrary to both prior and subsequent decisions recognizing that under New York law, a common carrier can limit its liability to customers for acts that do not constitute willful misconduct or gross negligence. *E.g.*, *Am. Tel. & Tel. Co. v. City of New York*, 83 F.3d at 556; *Net2Globe Int'l*, 273 F. Supp. 2d at 456 (S.D.N.Y. 2003); *Hamilton Employment Serv. v. New York Tel. Co.*, 171 N.E. 710, 711 (N.Y. 1930); *Denmark v. New York Tel. Co.*, 442 N.Y.S.2d 963, 963 (N.Y. App. Div. 1980); *see Light Jewelers, Inc. v. New York Tel. Co.*, 582 N.Y.S.2d 536, 538 (N.Y. App. Div. 1992); *Long Island Cent. Station, Inc. v. New York Tel Co.*, 387 N.Y.S.2d 897, 898 (N.Y. App. Div. 1976).

In the instant case, two sophisticated parties entered into an agreement that included a limitation on liability provision. Unlike the old public utility monopolies of the past, Global Crossing had no duty to provide service to CCT in the absence of the parties' contract. Although the parties heavily negotiated the Amendment, *CCT Commc'ns*, 2008 WL 2705471, at *3, and

16

modified portions of the RCA in the process, (*see Amendment*), they did not amend the exculpatory clause.  Under the circumstances, New York's contract rules relating to the enforceability of limitation of liability clauses render § 6.2 enforceable, subject to the public policy exception for willful misconduct and gross negligence.

**B.      The Enforceability of § 6.2 Under the Communications Act**

CCT contends that even if the exculpatory clause is enforceable under New York law against state law contract claims, it cannot defeat or limit a claim for damages under § 206 of the Communications Act.  I disagree.

Prior to detariffing, common carriers, including telephone companies, were required to file a tariff with the Federal Communications Commission ("FCC") showing all charges for each telephone service that it provided, as well as all classifications, practices, and regulations affecting such charges.  *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 221–22 (1998); *Fax Telecommunicaciones Inc. v. Am. Tel. & Tel.*, 138 F.3d 479, 482 (2d Cir. 1998); *see* 47 U.S.C. § 203(a).  The rights and liabilities of the parties could not be "varied or enlarged by either contract or tort of the carrier."  *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. at 227 (quoting *Keogh v. Chicago & Nw. Ry. Co.*, 260 U.S. 156, 163 (1922)).

The tariffs frequently included limitations on the carrier's liability that were considered part of the filed rates and were enforced absent willful misconduct or gross negligence.  *E.g.*, *Am. Tel. & Tel. Co. v. New York City Human Resources Admin.*, 833 F. Supp. 962, 974 (S.D.N.Y. 1993) (enforcing provision of tariff that limited plaintiff's liability to subscribers except in the case of willful conduct); *Denmark v. New York Tel. Co.*, 442 N.Y.S.2d at 963 (same); *Unimat, Inc. v. MCI Telecomm. Corp.*, 14 F.C.C.R. 7829, ¶ 12, at 7834 (1999) ("An

17

important principle of tariff law is the recognition of the carrier's right to place a reasonable

limitation on its own liability. This reasonable limitation will generally be enforced, absent

willful misconduct or gross negligence on the part of the carrier.") (footnotes omitted); *In the*

*Matter of Local Exchange Carrier Line Information Database*, 8 F.C.C.R. 7130, ¶ 27, at 7134

(1993) ("Limitation of liability provisions have long been accepted by the courts in the absence

of willful misconduct or gross negligence.") (footnote omitted); *Halpert, Inc. v. New York Tel.*

*Co.*, 6 F.C.C.R. 2548, ¶ 7, at 2849 (1991) ("[I]t is well established that communications common

carriers may reasonably limit their liability for loss of service suffered by a customer. The

Commission and the courts have reviewed tariff provisions which limit a carrier's liability to its

customers for service disruptions except in cases involving gross negligence or willful

misconduct and found them to be reasonable.") (footnotes omitted); *see Western Union Tel. Co.*

*v. Esteve Bros. & Co.*, 256 U.S. 566, 571 (1921) ("The limitation of liability was an inherent part

of the rate.").

In the wake of the Federal Telecommunications Act of 1996, the FCC issued an order

directing nondominant interexchange carriers to cancel their tariffs. *In the Matter of Policy and*

*Rules Concerning the Interstate, Interexchange Marketplace (Second Report and Order)*, 11

F.C.C.R. 20730, ¶ 3, at 20732–33 (1996) ("*Detariffing Order*"), *clarified in* 12 F.C.C.R. 20787

(1997), *aff'd sub nom.*, *MCI WorldCom, Inc. v. FCC*, 209 F.3d 760 (D.C. Cir. 2000). The

*Detariffing Order* reflected the recognition that the area had become highly competitive,

customers were free to switch, and market forces would control rates. *Id.* ¶ 21, at 20742–43, ¶

36, at 20750. Moreover, detariffing would prevent carriers from imposing unilateral limits on

their liability, and require the carriers to bargain for those limitations with their customers. *See*

*id.* ¶ 55, at 20762. Since detariffing, contractual limitations on liability have been enforced

18

against claims asserted under 47 U.S.C. § 206. *See Ryder Commc'ns, Inc. v. AT&T Corp.*, 18

F.C.C.R. 13603, ¶ 1 (2003) ( "[W]here two parties, through valid contracts, have clearly

allocated the risk of certain events, it is not unjust and unreasonable under section 201(b) [of the

Communications Act] for one party to hold the other party to his contractual allocation.").

Furthermore, state law governs the interpretation of a limitation of liability clause

asserted against a Communications Act damage claim.[13]  *Net2Globe International*, with facts

strikingly similar to this case, is directly on point.  There, Time Warner Telecom ("TWTC"), a

telecommunications carrier, entered into a contract to provide Net2Globe ("N2G"), a

telecommunications reseller, with long distance service.  273 F. Supp. 2d at 441–42.  Shortly

after TWTC began providing service, it discovered that all of the calls initiated through N2G

were directed to cellular rather than land-based telephones in Europe.  *Id.* at 442.  This resulted

in substantially increased costs to TWTC.  TWTC attempted to pass the increased rates on to

N2G, and also migrated N2G's traffic to other, less costly subcontractors.  *Id.*  When N2G

refused to pay the increases, TWTC terminated all service.  *Id.* at 443.

N2G subsequently sued TWTC for lost profits, alleging breach of contract and violations

of the Communications Act.  The contract, which incorporated TWTC's tariff, contained a clause

limiting TWTC's liability for consequential damages, including lost profits, regardless of the

---

[13]     In supplemental briefing requested by the Court, the parties agreed that New York law governs the interpretation of § 6.2 with respect to the Communications Act claims.  (*See CCT Communications, Inc.'s Supplemental Memorandum of Law in Response to June 22, 2011 Order*, dated July 1, 2011, at 6 ("[I]f the parties had any power by contract to eliminate such a statutory liability, the only law that would govern in this case would have to be the law of New York.") (ECF Doc. # 283); *Global Crossing Telecommunications, Inc.'s Supplemental Brief in Support of its Motion for Partial Summary Judgment on Damages*, dated July 1, 2011, at 3 ("New York state contract law-and not any generalized "federal" standard or other source of law-governs the scope of the damages waiver in Section 6.2 of the RCA.") (ECF Doc. # 284).)

cause. *Id.* at 449. N2G countered that the clause was void, *inter alia*, because TWTC's actions

constituted malice and wrongdoing. *Id.* at 451.

After tracing the New York law regarding the enforceability of clauses limiting liability

and the public policy exclusions, the district court concluded that the clause limiting liability was

enforceable and barred the recovery of lost profits. As to the contract claim, the court relied on

*Metropolitan Life I*, and ruled that TWTC's decision to terminate service was "economically

motivated," and could not, as a matter of law, "rise to the level of intentional wrongdoing

necessary to invalidate the contracts' limitation on liability provision." *Id.*

Turning to N2G's damage claims under § 206 of the Communications Act, *see id.* at 458

n.15, the court analyzed each claim and concluded that all lacked merit. *See id.* at 258–61. In

addition, the court held that its earlier conclusion that the contractual limitation of liability barred

any recoverable damages "presents an independent basis to deny N2G's relief under the

Communications Act." *Id.* at 461. In other words, the state law rules governing liability

limitations also barred recovery for lost profits under § 206 of the Communications Act. *Accord

Ryder Commc'ns, Inc.*, 18 F.C.C.R. 13603, ¶ 13, at 13608–09, & n.41 (noting that the district

court had enforced a waiver of consequential damages between the same parties with respect to

claims asserted under the Communications Act because AT&T's actions "did not rise to the level

of specific intent required by the 'willful and wanton' standard to set aside the limitation of

liability provision under New Jersey law.")

CCT cites several cases where courts invalidated clauses that limited damages under the

antitrust laws. Antitrust damages, including treble damages, advance public policy by

prohibiting and ultimately punishing conduct in restraint of trade. In *Fox Midwest Theaters v.*

20

*Means*, 221 F.2d 173 (8th Cir. 1955), the court explained why parties could not limit this liability:

> Any contractual provision which could be argued to absolve one party from liability for future violations of the anti-trust statutes against another would to that extent be void as against public policy. *This is because the effect of such a release could be to permit a restraint of trade to be engaged in, which would have impact, not simply between the parties, but upon the public as well.* Such a release, if recognized as having any validity of that nature, could therefore itself operatively serve as a contract "in restraint of trade." Section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. 1, of course, brands all contracts in restraint of trade as "illegal."

*Id.* at 180 (emphasis added) (citation omitted); *accord Kristian v. Comcast Corp.*, 446 F.3d 25, 47–48 (1st Cir. 2006) ("[O]ther circuits have similarly disapproved of waivers of statutory remedies for antitrust violations. On the basis of these precedents, we conclude that the award of treble damages under the federal antitrust statutes cannot be waived.") (citation omitted); *Gaines v. Carrollton Tobacco Bd. of Trade, Inc.*, 386 F.2d 757, 759 (6th Cir. 1967) ("[I]t seems clear as a matter of law that such an agreement, if executed in a fashion calculated to waive damages arising from future violations of the antitrust laws, would be invalid on public policy grounds.") (citation omitted). These cases are not apposite given the longstanding public policy that has allowed common carriers to limit their liability in the absence of willful misconduct or gross negligence. Similarly, a party cannot circumvent public policy by including an arbitration clause that limits the plaintiff's antitrust remedy or the relief that the arbitrator could award. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 637 n.19 (1985) ("[I]n the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy.") (*dicta*).

CCT also cites *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115 (2d Cir. 2010), a

sex discrimination case, where the court observed in *dicta* that it would not enforce an arbitration agreement that included a prohibitively short statute of limitations or fee shifting provisions because "a federal court will compel arbitration of a statutory claim only if it is clear that 'the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum,' such that the statute under which its claims are brought 'will continue to serve both its remedial and deterrent function.'" *Id.* at 125 (quoting *Mitsubishi*, 473 U.S. at 637). Antidiscrimination statutes, like the antitrust laws, are designed to deter conduct that is contrary to public policy and are subject to the same proscriptions as antitrust cases regarding efforts to limit liability. *See Chen-Oster v. Goldman, Sachs & Co.*, 10 Civ. 6950 (LBS) (JCF), 2011 WL 1795297, at *10 (S.D.N.Y. Apr. 28, 2011) ("[T]he vindication of statutory rights analysis may apply with equal force to enforcement of Title VII rights as to effectuation of antitrust prohibitions under the Sherman Act.") As discussed, there is no policy that prevents parties from contractually limiting their potential liability for Communications Act claims.

Finally, CCT refers to one Communications Act case in which, according to CCT, the court invalidated a limitation on liability for claims under § 206.[14] CCT has misread the case. In *Penberthy v. AT&T Wireless Servs., Inc.*, 354 F. Supp. 2d 1323 (M.D. Fla. 2005), the plaintiff sued alleging that the defendant had breached its statutory duty to protect the confidentiality of proprietary information, and sought damages under 47 U.S.C. § 206 for emotional pain and psychological injury. *Id.* at 1324–25. The parties' contract included an arbitration clause that prohibited the arbitrator from awarding relief "in excess of law contrary to what this Agreement provides." *Id.* at 1326. The agreement contained a clause that limited the defendant's liability for incidental, punitive and consequential damages, or for personal injuries unless due to gross

---

[14]     CCT also cites several cases for the unremarkable proposition that § 206 of the Communications Act confers a private right of action. (*See CCT Opposition* at 7 & n.6.)

negligence.  *Id*. at 1327.  Finally, the agreement contained a severability clause which provided

that if any portion of the arbitration clause was determined to be inapplicable or invalid, the

remainder would be given full force and effect.  *Id.* at 1326–27.

The issue before the court was whether the severability provision in the arbitration

agreement permitted or required the action to be arbitrated despite the discrepancy between the

damage remedy afforded by 47 U.S.C. § 206 and the terms of the arbitration agreement.  The

plaintiff argued that the entire arbitration agreement was invalid; defendant contended that the

issue should be decided by the arbitrator.  *Id.* at 1327.  Agreeing with the defendant, the court

concluded that the "the severability clause in the instant case permits the limitation of statutory

remedies and the claims to be considered by an arbitrator."  *Id*. at 1329.  In other words, the

arbitrator could decide, in the first instance, whether the limitation on remedies was valid.  The

court did not rule, as CCT suggests, that the limitation of liability was invalid because it was

inconsistent with 47 U.S.C. § 206.  (*See CCT Opposition* at 5–6.)

In a supplemental brief requested by the Court on a different issue, CCT cited *Am. Tel. &*

*Tel. Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214 (1998) to support an argument that "parties

cannot, by contract, effect [*sic*] the scope of liability created under the Communications Act.

The exclusion of liability only reaches those liabilities arising under the contract, not those

arising under the Communications Act."  (*CCT Communications, Inc.'s Supplemental*

*Memorandum of Law in Response to June 22, 2011 Order*, dated July 1, 2011, at 5 (ECF Doc. #

283).)  In that case, the plaintiff contracted to purchase telecommunication services from AT&T.

AT&T agreed to supply the services under terms more favorable than its filed tariff provided.

The plaintiff eventually sued AT&T for breach of contract and tortious interference with

23

contract, but the Supreme Court held that the filed rate doctrine barred the plaintiff's state law claims—the only claims the plaintiff had asserted.

The tariff included a clause limiting the plaintiff's liability, except that its "liability, if any, for its willful misconduct is not limited by this tariff." 524 U.S. at 228. The plaintiff argued that because the jury had found willful misconduct, the verdict did not conflict with the tariff. The Supreme Court rejected the argument ruling that the tariff could not revive a claim that was barred by the filed-rate doctrine. *See id.* ("It is the Communications Act that renders the promise of preferences unenforceable. The tariff can no more exempt the broken promise of preference that is willful than it can the broken promise of preference that is unintentional."); *accord* Katz v. MCI Telecommunications Corp., 14 F. Supp. 2d 271, 276 (E.D.N.Y. 1998) ("Indeed, prior to the Supreme Court's decision in *Central Office Telephone,* most courts that had considered the issue had held that the 'willful misconduct' clause did not revive claims otherwise barred by the filed rate doctrine, *i.e.,* claims directly related to tariffed rates.")

Here, Global Crossing is asserting the "willful misconduct" exception as a shield and not as a sword. It is not attempting to revive a claim barred by the Communications Act, but to limit its damages for an alleged violation of the Communications Act. Nothing in *Central Office Telephone* disturbs the long-standing doctrine permitting a carrier to limit its liability for statutory claims.

In summary, the parties may agree to limit their respective damage remedies for violations of New York law and the Communications Act except in the case of gross negligence or willful misconduct. Gross negligence is not at issue here, and New York's construction of "willful misconduct" applies to both the breach of contract and Communications Act claims.

The next question is whether Global Crossing's actions, which included call blocking and the

limitation or termination of services, was willful, *i.e.*, done for reasons other than economic self-

interest.

### C.    Willful Misconduct

The party asserting that public policy prohibits the enforcement of a clause limiting

damages bears the burden of proving that the party relying on the clause acted with gross

negligence or willful misconduct.  *See Kalisch-Jarcho*, 448 N.E.2d at 417–18; *cf. Baidu, Inc.*,

2010 WL 2900313, at *5 (denying motion to dismiss based on broad clause limiting liability

because plaintiff alleged sufficient facts to give rise to a plausible claim of gross negligence or

recklessness); *Deutsche Lufthansa*, 2007 WL 403301, at *4 (dismissing complaint where

plaintiff failed to allege misconduct required to invalidate limitation of liability clause);

*Colnaghi*, 611 N.E.2d at 284 (granting summary judgment where the plaintiff's allegations failed

to evince the recklessness necessary to abrogate the clause limiting the defendant's liability);

*L&S Motors, Inc. v. Broadview Networks, Inc.*, 808 N.Y.S.2d 777, 778 (N.Y. App. Div. 2006)

(affirming dismissal of complaint against provider of telephone services because "the plaintiff

did not allege conduct rising to the level of gross negligence or constituting malfeasance.").

The facts surrounding Global Crossing's call blocking and withholding of services have

already been discussed, and CCT has not proffered any evidence that Global Crossing engaged

in "willful misconduct" within the meaning of the public policy exclusion.  Global Crossing

made an unprofitable deal; it was concerned about the costs resulting from the traffic CCT was

terminating in the Zero-Rated Destinations, and sought to renegotiate.  It sent proposed

amendments to Vlahos, and plainly wanted to continue to do business with Vlahos but on more

favorable terms.  It was only when Vlahos declined to sign the proposed amendment (I do not

25

suggest that he should have) that Global Crossing engaged in "self-help," essentially obtaining

the benefit of the proposed amendment without Vlahos's consent.  The parties continued to live

under their agreement, as unilaterally modified by Global Crossing, for the next three years.

CCT concedes that Global Crossing acted out of its own economically motivated

financial self-interest.  (*CCT Opposition* at 26) ("[T]here is no dispute that Global Crossing

failed to furnish service and blocked CCT's calls for its own economically motivated financial

self-interest . . . .").  Further, nothing in the record supports the contention that Global Crossing

acted out of malice toward CCT or Vlahos, or for the purpose of inflicting harm.  It blocked calls

and withheld service to limit its losses under an Amendment that it regretted from the moment it

was signed.  The consequence of the course Global Crossing chose to follow—assuming Global

Crossing breached the parties' agreements—is to pay damages, except to the extent that the

limitation of liability in § 6.2 of the RCA frees it from the debt.  The next section of this opinion

explores the final issue—the scope of that limitation.

### D.    The Scope of § 6.2

When asked to interpret contractual language on a motion for summary judgment, the

question is "whether the contract is unambiguous with respect to the question disputed by the

parties." *Law Debenture Trust Co. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010)

(quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002));

*Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir. 2010).  This presents a question

of law.  *Maverick Tube*, 595 F.3d at 465.

A contract is ambiguous if it "could suggest more than one meaning when viewed

objectively by a reasonably intelligent person who has examined the context of the entire

integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Int'l Multifoods*, 309 F.3d at 83 (internal quotation marks omitted); *Cont'l Ins. Co.*, 603 F.3d at 180; *Maverick Tube*, 595 F.3d at 466. "[E]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." *Maverick Tube*, 595 F.3d at 466 (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990)). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation," *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989), unless each is a "reasonable" interpretation. *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992); *accord Maverick Tube*, 595 F.3d at 467; *see Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996) ("no ambiguity exists where the alternative construction would be unreasonable"). Furthermore, a contract is not ambiguous where the interpretation urged by one party would "strain [ ] the contract language beyond its reasonable and ordinary meaning." *Bethlehem Steel Co. v. Turner Constr. Co.*, 141 N.E.2d 590 (N.Y. 1957); *accord Maverick Tube*, 595 F.3d at 467. "[I]f the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 171 (N.Y. 1992); *accord Maverick Tube*, 595 F.3d at 468.

RCA § 6.2, entitled "*Exclusion of Consequential Loss*," consists of an introductory phrase ("[i]n no circumstances shall either we or you be liable for . . .) followed by two clauses separated by the conjunction "or." The first clause frees both parties for "indirect, consequential, reliance, or special loss or damages." The second eliminates damages based on "lost revenues, lost savings, lost business opportunity or lost profits of any kind." Although we are dealing with

27

words and phrases used in contract, and the question of interpretation turns on what the parties intended them to mean, some of the words and phrases in § 6.2 are typical and commonly understood.

At the risk of oversimplification, the law divides damages for breach of contract into "general" and "consequential." *See ATI Telecom, Inc. v. Trescom Int'l, Inc.*, 95 Civ. 9749 (DC), 1996 WL 455010, at *2 (S.D.N.Y. Aug. 12, 1996) (Chin, J.).  A party aggrieved by a breach of contract may recover general damages without regard to the contemplation of the parties.  *See* 3 DAN B. DOBBS,  LAW OF REMEDIES § 12.4(7), at 98 (1993) ("DOBBS").  "General" damages are those that flow naturally and probably from the breach.  *Am. List Corp. v. U.S. News & World Report, Inc.*, 549 N.E.2d 1161, 1164 (N.Y. 1989); *Kenford Co. v. County of Erie*, 537 N.E.2d 176, 178 (N.Y. 1989); *see Schonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000) ("A plaintiff is seeking general damages when he tries to recover 'the value of the very performance promised.'" (quoting 3 DOBBS § 12.2(3), at 39)).  General damages are synonymous with "direct" damages, *see* BLACK'S LAW DICTIONARY 446 (9th ed. 2009) ("BLACK'S") (noting that "general damages" are also termed "direct damages"), and provide the aggrieved party with the difference between the price he agreed to pay and the value he was to receive through performance.[15]  3 DOBBS § 12.2(1), at 21.

"Consequential," "special" and "indirect" damages are synonymous terms, *see* BLACK'S at 445–46 ("[C]onsequential damages . . . [are a]lso termed indirect damages."); 3 DOBBS § 12.2(3), at 38 ("[S]pecial damages is also referred to as consequential damages. . . ."), that "seek to compensate a plaintiff for additional losses (other than the value of the promised performance)

---

[15]    Similarly, "expectancy" damages award the plaintiff the benefit of the bargain, or the value of the promised performance less the costs he avoids by not performing his own side of the bargain.  3 DOBBS § 12.2(1), at 25.

that are incurred as a result of the defendant's breach." *Schonfeld*, 218 F.3d at 176.

Consequential damages are not based on the present value of the promised performance but on

the benefits that the performance will produce or the losses its absence may cause. 3 DOBBS §

12.2(3), at 41. In simplest terms, "[g]eneral damages measure the losses in the very thing to

which the plaintiff is entitled . . . [while c]onsequential damages measure . . . the income it can

produce or the losses it can avoid." 1 DOBBS § 3.3(4), at 304.

"Lost profits" may reflect either general or consequential damages. As the Second

Circuit explained:

> Lost profits are consequential damages when, as a result of the breach, the non-
> breaching party suffers loss of profits on collateral business arrangements. In the
> typical case, the ability of the non-breaching party to operate his business, and
> thereby generate profits on collateral transactions, is contingent on the
> performance of the primary contract. When the breaching party does not perform,
> the non-breaching party's business is in some way hindered, and the profits from
> potential collateral exchanges are "lost."

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d. Cir. 2007); *accord*

3 DOBBS § 12.2(3), at 42 ("The clear case of damages truly based on lost profits that also count as

consequential damages is the case of lost operating profits of a business.") Thus, where the

plaintiff sues to recover the profits he would have earned by reselling the defendant's goods or

services to a third party, he is seeking consequential damages. *See* 3 DOBBS § 12.2(3), at 42–43.

In some cases, however, "lost profits" may represent general damages. As the court in

*Tractebel Energy Mktg.* further explained:

> By contrast, when the non-breaching party seeks only to recover money that the
> breaching party agreed to pay under the contract, the damages sought are general
> damages. *See Am. List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38,
> 44, 550 N.Y.S.2d 590, 549 N.E.2d 1161 (1989). The damages may still be
> characterized as lost profits since, had the contract been performed, the non-
> breaching party would have profited to the extent that his cost of performance was
> less than the total value of the breaching party's promised payments. But, in this

29

case, the lost profits are the direct and probable consequence of the breach.  *See id.*  The profits are precisely what the non-breaching party bargained for, and only an award of damages equal to lost profits will put the non-breaching party in the same position he would have occupied had the contract been performed.  *See id.*

487 F.3d at 109–10 (footnotes omitted); *see Am. List Corp.*, 549 N.E.2d at 1164.  Furthermore,

since "lost revenues" are a part of the lost profits equation, *In re Best Payphones, Inc.*, No. 01-

15472 (SMB), 2007 WL 1388103, at *17 (Bankr. S.D.N.Y. May 8, 2007) ("[L]ost profits consist

of the lost revenues less the expenses saved over the remaining life of the [contract]."), *aff'd*, 432

B.R. 46 (S.D.N.Y. 2010), "lost revenues" are subject to the same distinction.

Finally, "reliance damages" refers to the expenditures made in preparation for

performance or in performance less any loss the aggrieved party would have suffered had the

contract been performed.  RESTATEMENT (SECOND) OF CONTRACTS § 349 (1981); *see* BLACK'S

448; 3 DOBBS § 12.2(1), at 52.  For example, if a retailer contracts to buy merchandise from a

supplier and advertises the merchandise for resale, the advertising costs are reliance expenses

and, upon the supplier's breach, the retailer can recover reliance damages as an alternative to

expectancy damages.  3 DOBBS § 12.2(1), at 52.

Returning to § 6.2 of the RCA, the meaning of the first clause, standing alone, is

straightforward.  It expressly bars all consequential and reliance damages.  Instead, the ambiguity

lies in the second clause which bars "lost revenues, lost savings, lost business opportunity or lost

profits of any kind."  Global Crossing contends that the second clause excludes claims for direct

damages, and that CCT is limited to restitution—the services it paid for under the Amendment

but never received.  (*Global Crossing Memo* at 2 n.1 ("Section 6.2 does not purport to prohibit

CCT's entitlement to all damages for a breach.  Rather, restitution damages are recoverable.");

*Global Crossing Telecommunications, Inc.'s Reply Memorandum of Law in Support of Motion*

*for Summary Judgment on Damages*, dated March 31, 2011 ("*Global Crossing Reply*"), at 6

(ECF Doc. # 243) ("[T]he plain meaning of the clause itself is manifest—any non-restitution

damages are excluded.").)  It argues that by separating the second part of the clause from the first

with the conjunction "or," and by including in it the words "of any kind," the parties meant to bar

claims for both direct and consequential lost revenues, lost savings, lost business opportunity,

and lost profits.  (*Global Crossing Memo* at 16.)  Specifically, the "or" is disjunctive, and the

various "lost" categories following it stand in contrast to the "broad" categories of damages in

the first clause.  (*Id.*)  This contrast is amplified by the words "of any kind"; while the broad

theories are limited to consequential and other collateral losses, the "lost" theories are "of any

kind," including both direct and indirect theories of damages.  (*Id.*)

     Global Crossing gives special weight to "lost savings."  According to Global Crossing,

"savings" means the difference between the lower costs that a buyer obtains by purchasing a

service at a below market price, as "a shopper achieves savings by buying at a discount," or, put

differently, "the additional profit that the buyer would have earned as a result of the below-

market price services to be provided by the seller."  (*Global Crossing Memo* at 22.)  "Savings"

are "lost" when "a buyer is deprived of a below-market buying opportunity and must purchase

equivalent goods or services at the higher market price."  (*Global Crossing Reply* at 8.)  This

definition of lost savings directly corresponds with a market value recovery, which would award

CCT "the difference between the contracted-for price and the price at which the service may

otherwise have been available in the market to CCT."  (*Global Crossing Memo* at 23.)  In short,

"lost savings" equates to the ordinary benefit of the bargain market damages that an aggrieved

party could recover as general damages.

Global Crossing cites a number of sources to support its interpretation of "savings" and "lost savings." (*Id.* at 23–23.)[16] Global Crossing also argues that its interpretation of "savings" is consistent with the usage in the telecommunications industry, citing a promotional document from Arbinet, the "telecommunications services company that CCT has repeatedly held up as the definitive provider of 'market price' telecommunications transactions." (*Declaration of Elizabeth Marks in Support of Global Crossing Telecommunications, Inc.'s Motion for Protective Order*, dated March 1, 2011, Ex. 8 (ECF Doc. #232).)

CCT interprets the second clause more narrowly. It claims that "lost revenues" and "lost profits" are examples of consequential losses and that "lost savings" is an example of reliance (or, in the alternative, consequential) damages. (*CCT Opposition* at 46 (Lost savings refers to "funds . . . , *i.e.*, expenditures, made in reliance on the contract.").) To support this interpretation, CCT notes that reliance damages measure "the extent that the plaintiff expends money in essential reliance," and that a "typical use of the phrase 'lost savings' in ordinary parlance might be 'the investor lost all his savings in reliance on Mr. Madoff's ponzi scheme.'" (*Id.*)

In addition, CCT disputes Global Crossing's definition of "lost savings," arguing that it simply reflects another type of consequential loss. (*Id.* at 47 ("Lost savings are equally consequential as are lost profits.").) Thus, CCT notes, courts have required parties attempting to claim "lost cost savings" to show that they communicated their special circumstances and that the loss was reasonably foreseeable (a requirement for obtaining consequential, but not direct,

---

[16]    *See, e.g.*, Stanley Warner & Fredrick Whitehurst, *An Illustration of Inventory Loss Measurements Under the LCM Rule*, 1 ACCT. EDITOR'S J. 33 (Fall 1988) (describing "lost cost savings" as "the reduction in replacement cost"); *Speaking TEM-ese*, TELECOM MANAGER'S VOICE REP., Nov. 27, 2006, at 8, *available at* http://www.thevoicereport.com/2006-11-27/VoiceReport2006-11-27.pdf (describing the term "revenue leakage" as "lost savings, for example, the difference in what you contracted for and what you're paying.").

damages.)  (*Id.* at 47 (citing *ProfiTel Group, LLC v. PolyOne Corp.*, 238 Fed. Appx. 444, 450

(11th Cir. 2007) ("A claim for lost cost-savings is analogous to a claim for lost profits. . . . [I]t

requires that the[y] . . . were within the contemplation of the parties at the time the contract was

made, the loss . . . is the probable result of the breach of contract, and . . . [they] are not remote

and speculative.")).)

Having considered the parties' arguments and examined the parties' entire contract, I

conclude that § 6.2, specifically the second clause, is ambiguous.  As noted, the first clause is

clear.  It bars consequential damages, and neither party has disputed this.  Thus, CCT cannot

recover lost profits because it was unable to resell the telecommunication services that Global

Crossing failed to deliver.

As noted, the second clause presents the interpretative problem.  Its introduction by the

disjunctive "or," suggests that the various categories of "lost" damages ("of any kind") add

additional limitations to those in the first clause.  For example, the second clause may bar "lost

profits" or "lost revenues" that fall within the category of general damages.  Furthermore, "lost

savings" is inherently ambiguous, and rarely appears in the case law.  CCT's interpretation,

which essentially equates the term with reliance damages, lacks support.

On the other hand, Global Crossing's argument that § 6.2, and particularly the phrase

"lost savings," bars all damages other than restitution is a stretch.  Section 6.2 expressly bars

consequential and indirect damages, but does not mention general or direct damages.  If § 6.2

was intended to bar general damages and direct damages, it could have said so directly.

Furthermore, the heading of § 6.2, "exclusion of consequential loss," is relevant to the

interpretation of an ambiguous exculpatory clause, *see World-Link, Inc. v. Citizens Telecomms.*

33

*Co.*, No. 99 Civ. 3054 (GEL), 2000 WL 1877065, at *3 (S.D.N.Y. Dec. 26, 2000) (Lynch, J.), and suggests that § 6.2 was not meant to encompass general damages.

Finally, although the exculpation granted by § 6.2 is mutual, other provisions of the RCA allow Global Crossing to recover the type of "lost revenues" or "lost profits" generally associated with direct damages. If Global Crossing terminated the RCA based on a CCT breach, CCT was required to pay Global Crossing 100% of the Monthly Recurring Charges ("MRC") remaining for the service term in addition to charges, if any, relating to the early termination of any local access circuits. (*RCA* § 5.3; *accord Vlahos Decl.*, Ex. 8 at § 6.8.) The parties agreed that the termination fees provided for in § 5 of the RCA "are based on agreed *revenue* expectation and are not a penalty." (*RCA* § 5.3 (emphasis added).) The MRC was $71 per concurrent call session, (*Amendment* ¶ 7), and CCT "purchased" 1,344 concurrent call sessions for a period of three years ending in December 2009. Hence, if CCT breached the parties' contract and Global Crossing terminated it, CCT still had to pay $95,424 per month until December 2009. This amount reflected direct damages—the lost revenues under the parties' contract.

Accordingly, I decline to interpret the full scope of § 6.2 as a matter of law, except to the extent that I conclude, as both sides agree, that it bars claims for consequential, indirect or special damages. These categories include any damage theories based on what CCT could have earned through contracts with third parties who might have bought or used the telecommunications services that Global Crossing failed to provide. I expressly decline to conclude as a matter of law that § 6.2 bars general or direct damage claims, but recognize the possibility that extrinsic evidence, including trade usage, may explain its meaning.

**CONCLUSION**

Section 6.2 is enforceable, and bars claims for consequential damages.  Whether it also bars claims for general, direct damages is unclear and must be resolved at trial.  The Court has considered the parties' other arguments and concludes that they lack merit.

So ordered.

Dated:  New York, New York
        July 22, 2011

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge